917 F.2d 1093
 54 Fair Empl.Prac.Cas. 317,
55 Empl. Prac. Dec. P 40,405
James L. TIMM; Robert Lofquest; William H. Clark; David
Piercy; Ronald R. Ell; Kerry Wells; Dale A. Brown;
Douglas O'Keefe; Pete Dwyer; and Harold Irwin,
Individually and on behalf of others similarly situated, Appellees,
v.
Frank GUNTER, individually and in his capacity as Director
of Nebraska Dept. of Correctional Services; Gary Grammer,
individually and in his former capacity as Warden for
Nebraska State Penitentiary; John Shaw, individually and in
his former capacity as Associate Acting Warden for Nebraska
State Penitentiary; Harold Clarke, Individually and in his
capacity as Warden for the Nebraska State Penitentiary; The
Class of All Present and Future Female Employees at the
Nebraska State Penitentiary, Julie Kouma, solely in her
capacity as representative of the Defendant Female Class, Appellants,
The Class of All Present and Future Male Employees at the
Nebraska State Penitentiary, and Tony Cruz, solely
in his capacity as Representative of the
Defendant Male Class, Intervenors.
James L. TIMM; Robert Lofquest; William H. Clark; David
Piercy; Ronald R. Ell; Kerry Wells; Dale A. Brown;
Douglas O'Keefe; Pete Dwyer; and Harold Irwin,
Individually and on behalf of others similarly situated, Appellees,
v.
Frank GUNTER, individually and in his capacity as Director
of Nebraska Dept. of Correctional Services; Gary Grammer,
individually and in his former capacity as Warden for
Nebraska State Penitentiary; John Shaw, individually and in
his former capacity as Associate Acting Warden for Nebraska
State Penitentiary; Harold Clarke, Individually and in his
capacity as Warden for the Nebraska State Penitentiary, Appellants,
The Class of All Present and Future Female Employees at the
Nebraska State Penitentiary, Julie Kouma, solely in her
capacity as representative of the Defendant Female Class,
The Class of All Present and Future Male Employees at the
Nebraska State Penitentiary and Tony Cruz, solely in his
capacity as Representative of the Defendant Male Class, Intervenors.
James L. TIMM; Robert Lofquest; William H. Clark; David
Piercy; Ronald R. Ell; Kerry Wells; Dale A. Brown;
Douglas O'Keefe; Pete Dwyer; and Harold Irwin,
Individually and on behalf of others similarly situated, Appellees,
v.
Frank GUNTER, individually and in his capacity as Director
of Nebraska Dept. of Correctional Services; Gary Grammer,
individually and in his former capacity as Warden for
Nebraska State Penitentiary; John Shaw, individually and in
his former capacity as Associate Acting Warden for Nebraska
State Penitentiary; Harold Clarke, Individually and in his
capacity as Warden for the Nebraska State Penitentiary; The
Class of All Present and Future Female Employees at the
Nebraska State Penitentiary, Julie Kouma, solely in her
capacity as representative of the Defendant Female Class, Appellants,
The Class of All Present and Future Male Employees at the
Nebraska State Penitentiary, and Tony Cruz, solely
in his capacity as representative of the
Defendant Male Class, Intervenors.
James L. TIMM; Robert Lofquest; William H. Clark; David
Piercy; Ronald R. Ell; Kerry Wells; Dale A. Brown;
Douglas O'Keefe; Pete Dwyer; and Harold Irwin,
Individually and on behalf of others similarly situated, Appellants,
v.
Frank GUNTER, individually and in his capacity as Director
of Nebraska Dept. of Correctional Services; Gary Grammer,
individually and in his former capacity as Warden for
Nebraska State Penitentiary; John Shaw, individually and in
his former capacity as Associate Acting Warden for Nebraska
State Penitentiary; Harold Clarke, Individually and in his
capacity as Warden for the Nebraska State Penitentiary; The
Class of All Present and Future Female Employees at the
Nebraska State Penitentiary, Julie Kouma, solely in her
capacity as representative of the Defendant Female Class;
The Class of All Present and Future Male Employees at the
Nebraska State Penitentiary, and Tony Cruz, solely in his
capacity as Representative of the Defendant Male Class, Appellees.
 Nos. 89-2616, 89-2617, 90-1135 and 90-1189.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 10, 1990.
Decided Oct. 26, 1990.
 
 Gregory H. Perry, Marie C. Pawol, Asst. Atty. Gen., argued, Lincoln, Neb., for Gunter.
 Alan Peterson, Lincoln, Neb., for appellees.
 Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 This is a class action brought by inmates of the Nebraska State Penitentiary (hereinafter "NSP"). They complain that for the prison administrators to allow female guards to perform pat searches and to see them nude or partially nude violates their right to privacy. The female guards counter with equal employment claims. The decision of the District Court[1] granting the inmates partial relief has left all the parties less than satisfied, and all appeal.[2] We affirm in part and reverse in part.
 
 I.
 
 2
 NSP is an all-male maximum security prison designed to house prisoners who have been classified as requiring medium or maximum security. Its population averages more than 600 inmates. Housing at NSP is comprised of four main housing units numbered 1-4 (hereinafter "Units 1-4"); a maximum security unit (hereinafter "Unit 5"); and a dormitory-style medium security unit (hereinafter "Unit 6"). There are approximately thirty-five staff supervisors and 215 guards at NSP.
 
 
 3
 Each of the housing units in Units 1-4 contains two control rooms, one for each two-story wing in the unit. There is always an officer on duty in the control room. Besides having visual access to the two-story wing, the control room officer is responsible for monitoring the two shower rooms on the wing. This is done through the use of two small windows which look into the shower rooms. One window looks into the lower shower room, one into the upper room. Monitoring of the shower rooms is performed by occasionally glancing through the windows.
 
 
 4
 Each unit in Units 1-4 has four shower rooms, with three shower heads in each. There are no curtains in the shower room, although there is a curtain separating the shower room from an outer vestibule, which opens into the hallway. There is no door between the vestibule and the hallway. The rooms are situated so that the vestibule cannot be viewed from the control rooms, and the showers cannot be viewed from the hall.
 
 
 5
 Each cell in Units 1-4 contains an unenclosed toilet that is located immediately inside the cell door. When the door is opened inward, the toilet is in direct view from the hall. The solid cell doors contain a small window approximately five feet from the ground.
 
 
 6
 At fixed times throughout the day, the staff checks all cells by looking through the windows in order to determine that all inmates are present. The staff is required to see "living flesh" during this procedure to ascertain that inmates are in their cells. If the guard cannot see the inmate through the window, the guard knocks on the door. If there is no response, the door is opened. The hallways are subject to patrolling at all times. Unannounced room checks and "shakedowns" are also performed.
 
 
 7
 Unit 5 consists of three galleries, which contain single-inmate cells. It is the most secure unit at NSP. Each cell contains a toilet in the rear of the cell, which is visible through the window on the cell door. Strip searches are performed routinely in the "bullpen" area of the unit, a secured area in the hallway enclosed by open bars. The bullpen is visible from the hallway.
 
 
 8
 There are five individual shower stalls in Unit 5, located in the galleries' hallways. The shower heads are located on the wall opposite the cells, with a partial wall running parallel to the wall. The sides of each shower stall are open. Guards observe the showering inmates from approximately thirty feet away, through two sets of open bars.
 
 
 9
 Unit 6 is a dormitory-style unit which houses only medium-custody inmates. It contains three open sleeping "bays," with single beds arranged in rows in a large room. Inmates dress and undress next to their bed in the sleeping bay; there is no dressing screen available or permitted. The bathrooms in Unit 6 can be viewed from a window in a hallway. Toilets are visible from the window; some have partitions but none have doors. The showers in these bathrooms are visible from either the window or the doorway. Some of the showers have curtains; the prison plans to install curtains on all showers in Unit 6. The bays and bathrooms are subject to continual visual surveillance, counts, and shakedowns.
 
 
 10
 The outside recreation "yard" contains a urinal located under the guard tower, which is approximately thirty feet above the urinal. The urinal is screened on three sides by a waist-high wall. Inmates are also permitted to leave the yard to use the toilets in the housing units at certain times.
 
 
 11
 Pat searches are conducted routinely at NSP: during shakedowns, when inmates move between certain areas of the penitentiary, and when it is deemed necessary for security purposes. The pat searches performed at NSP are clothed searches of the body, and involve the guard running his or her hands over the inmate's clothing. It takes approximately ten seconds to perform a pat search. Strip searches are performed when inmates enter and leave the visitors' area, and at other times when deemed necessary. Strip searches are performed on a routine basis only in Unit 5.
 
 
 12
 In 1983, prison administrators opened all jobs at NSP to applicants on a sex-neutral basis. Female employees were allowed to conduct pat searches on the same basis as male employees, and were put in positions which allowed observation of inmates showering and using toilet facilities, but were not permitted to conduct strip searches.
 
 
 13
 This policy was challenged by two inmates in 1985. In Nielsen v. Gunter, No. CV83-L-682 (Mag. Neb. July 15, 1985), the Magistrate[3] ruled that inmates be given access to showers not visible to female guards and that an inmate, when subject to a pat search, be allowed to demand that the search of his groin area be performed only by a male guard. The judgment of the Magistrate was affirmed by the District Court and no further appeal was taken.
 
 
 14
 In response to this ruling prison administrators developed a new policy which requires that female guards, before pat-searching an inmate, ask the inmate if he would prefer to be searched by a male guard. If the inmate so desires, the pat search is delayed until a male guard arrives. Female officers currently are not assigned to one-person posts as a result of this policy. The policy also excludes female officers from second-shift assignments, so that inmates have the option to shower without being viewed by female guards. Female guards are also not assigned to posts in Unit 5.
 
 
 15
 Seeking damages and injunctive relief, the inmates filed this suit under 42 U.S.C. Sec. 1983 (1988) against the prison administrators, asserting a constitutional claim that their right of privacy was being violated as the result of being viewed while partially or totally nude while showering, using toilet facilities, dressing and undressing, and sleeping.[4] This viewing occurs in the cells, the sleeping bays, the shower rooms, and the bathrooms. The inmates also claimed that the pat searches performed by female guards similarly violated their right of privacy. Finally, the plaintiffs alleged that, as a result of more privacy protections afforded female inmates at the Nebraska Center for Women (hereinafter "NCW"), the female counterpart to NSP, their equal protection rights were violated.[5]
 
 
 16
 The female employees, who were brought in as a defendant class, claimed that as a result of being required to obtain inmate consent before performing pat searches, being excluded from second-shift and one-officer posts, and being excluded from all posts at Unit 5, they were denied equal employment opportunities in violation of 42 U.S.C. Sec. 2000e-2(a) (1988) (Title VII). They sought injunctive relief.
 
 
 17
 The defendant prison administrators took the position that their responsibility to balance security interests and equal employment interests in an efficient, cost-effective manner required that essential security measures be conducted on a sex-neutral basis, and that they be allowed the discretion to develop security measures that adequately balanced the competing interests.
 
 
 18
 The District Court rejected the inmates' equal protection claims, but granted them partial relief on their privacy claims. Specifically, the Court ordered the following accommodations: 1) all guards are to be instructed to refrain from deliberately searching an inmate's genital and anal areas while conducting a pat search; 2) female guards shall be allowed to perform pat searches on the same basis as male guards; 3) inmates, upon request, shall be pat searched by male guards, if the attending female guard decides that such a request is not disruptive and does not pose an undue security risk; 4) female guards shall be instructed to make "minor accommodations of courtesy" when patrolling rooms and galleries to avoid viewing inmates who are using toilet facilities or in a state of undress; and 5) prison administrators shall make various physical and schedule modifications at NSP to accommodate prisoner privacy interests.[6] The court found that the prison policy of staffing Unit 5 with male employees only did not violate Title VII. The court later awarded the inmates' attorney $34,103.26 in attorney fees and $1,507.50 in expenses.
 
 
 19
 On appeal, the prison administrators seek to overturn all of the District Court's ordered accommodations and the award of attorney fees and expenses. The class of female employees seeks to have reversed the gender-based pat search restrictions ordered by the court and the ordered modification of employee schedules that requires that only male guards staff the control rooms for at least two hours a day. The female employees also seek to require the administrators to assign female guards to Unit 5. The class of inmates seeks to have the ordered accommodations upheld, but urges us to require various modifications designed to increase the inmates' level of privacy. The inmate class also seeks to have the District Court's rejection of their equal protection claim reversed.
 
 
 20
 For the reasons set forth below, we reverse the District Court's orders concerning pat searches. We also reverse the court's order requiring physical and staffing modifications at NSP, its order that female guards make "minor accommodations of courtesy" while monitoring inmates, and the award of attorney fees and expenses. Finally, we affirm the Court's denial of the inmates' equal protection claims and its denial of the female employees' equal employment claims with respect to Unit 5.[7]II.
 
 
 21
 We begin our analysis by noting that while inmates may lose many freedoms at the prison gate, they retain at least some of their constitutional rights while confined. Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984). Prisoners are to "be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Hudson v. Palmer, 468 U.S. at 523, 104 S.Ct. at 3198.
 
 
 22
 An equally important precept, however, is that a prisoner's rights may be limited or constrained in significant ways, in order to further the penal system's legitimate objectives. Id. at 524, 104 S.Ct. at 3199. Foremost among these objectives is internal security. Id. Thus, when addressing an inmate's claim of alleged constitutional violations, we must consider whether the constrictions that prison administrators have placed on the inmate's rights are justified by legitimate institutional concerns. Cf. Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1978) ("when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in light of the central objective of ... safeguarding institutional security."). The judgment exercised by prison administrators in striking a balance between the rights of prisoners and the demands of institutional security is to be given great deference. Id.; Turner v. Safley, 482 U.S. at 85, 107 S.Ct. at 2259-60. Such a balancing act is an exceedingly complex task, and not one easily undertaken by the courts, whose expertise in the imperatives of institutional security is slight and in no way approaches that of the professional administrators charged with the awesome task of running our prisons.
 
 
 23
 The case at hand is an excellent example of the difficult, multi-faceted balancing that must be performed by prison administrators. The administrators at NSP must weigh the rights of the prisoners, the equal employment rights of both the female guards and the male guards, and the institutional need for internal security. To do so properly requires "expertise, planning, and the commitment of resources," Turner v. Safley, 482 U.S. at 85, 107 S.Ct. at 2259, as well as the ability to experiment and to be flexible.
 
 
 24
 In considering a case of this sort, we use the standard of review set forth by the Court in Turner.[8] Specifically, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89, 107 S.Ct. at 2261. Four factors are relevant in deciding whether or not a regulation is reasonable. First, there must be a sufficient connection between the regulation and the governmental interest used to justify the regulation. Id. Second, the availability of alternative means of exercising the right at issue must be considered. Id. at 90, 107 S.Ct. at 2262. Third, consideration is required of the impact that accommodating the asserted right would have on guards, other inmates, and prison resources. Id. Fourth, the availability of ready alternatives to the regulation should be considered. Id. The Court stressed that this last factor is not a " 'least restrictive alternative' test," id., but rather a de minimis test: if there is an alternative available at only a de minimis cost to prison objectives, that is evidence of an unreasonable regulation. Id. at 91, 107 S.Ct. at 2262-63.
 
 A.
 
 25
 Pat searches serve two purposes in a correctional institution: they detect contraband, and they deter the movement of contraband within the institution. It is undisputed that pat searches, both on a routine basis and prior to unannounced "cell shakedowns," are essential to maintaining proper prison security. Testimony at trial indicated that in the one-year period preceding trial, over one hundred inmates at NSP were found to be in possession of weapons. During the same period, over seventy-five inmates were caught with illegal drugs. In the preceding five-year period, over one hundred inmates were caught with escape equipment. Although pat searches are necessary, the question remains whether the pat searches performed by female guards on male inmates at NSP can be considered unreasonable. We are persuaded that allowing such searches on the same basis as same-sex pat searches is a reasonable regulation as applied at NSP, and thus is not a constitutional violation.
 
 
 26
 The record shows that all NSP employees are trained to perform pat searches in a professional manner, conforming to the generally accepted practices in the field. This training does not include instruction to deliberately search an inmates' genital and anal areas, although an incidental touching of such areas may occur during the search.
 
 
 27
 The District Court found that any touching of the genital and anal areas is brief and incidental. Several female officers also stated that they have never intentionally touched an inmate's genital or anal areas. In fact, the representative of the plaintiff class, James Timm, testified that he never had experienced being touched in those areas by a female guard.
 
 
 28
 The District Court found that at NSP most inmates do not reject opposite-sex pat searches with "great frequency."[9] Timm v. Gunter, No. CV85-L-501, at 25 (D.Neb. Dec. 13, 1988) (Memorandum of Decision). It also found that "(t)he invasion of inmates' privacy in the performance of a pat search is not substantial," id. at 26, and therefore found that the inmates' constitutional rights "have not been violated on occasions when they have been subjected to pat searches by female officers without their consent." Id.
 
 
 29
 We agree. Although an inmate may very well retain some privacy rights when entering a prison, such rights, when balanced against the legitimate equal employment rights of male and female guards, and against the internal security needs of the prison, must give way to the use of pat searches on a sex-neutral basis as performed at NSP.
 
 
 30
 The first Turner factor, the connection between the prison regulation (sex-neutral pat searches) and the government interests justifying it (internal security and equal employment opportunities), is clear and requires no further explanation. While there may not be an alternative method available for an inmate to exercise his right of privacy while being pat searched, the search is of such short duration and of such minimum obtrusiveness that this factor is of minimum importance. Further, accommodating a right to be free from opposite-sex searches would greatly burden guards and prison resources. There was abundant testimony at trial indicating the problems that arise when female guards are prohibited from conducting pat searches on the same basis as male guards.[10] Finally, the alternatives available impose more than a de minimis cost to the prison administration's objectives of maximizing internal security, providing equal employment opportunities, and containing costs.
 
 
 31
 Thus, we believe the District Court erred in requiring prison administrators to accommodate inmates' rights to be free from opposite-sex pat searches. While it may be that prison administrators could so accommodate such concerns if they deemed it necessary or desirable,[11] they are not required to do so. The administrators have decided that the best balance among the competing concerns is to allow pat searches on a sex-neutral basis; deciding that this is not an unreasonable regulation, we defer to their judgment and expertise.[12]
 
 B.
 
 32
 Many of the considerations in the opposite-sex pat search analysis apply with equal force to the issue of visual surveillance of male inmates by female guards. Like pat searches, visual surveillance is an essential factor in maintaining prison security. Trial testimony established that in the one-year period preceding trial, there were sixty-seven assaults on staff members by inmates at NSP, seven of which resulted in serious injury. Further, nine inmate-on-inmate assaults in that time period resulted in serious injury. There are frequent inmate-on-inmate assaults, some of which are of a sexual nature. In such an atmosphere, round-the-clock visual surveillance of the inmates is crucial and must cover inmates in all areas of the prison, including bathrooms and showers.
 
 
 33
 At the same time, however, constant visual surveillance of each inmate is not practical. Instead, guards must watch inmates on an intermittent basis. At NSP, such surveillance includes monitoring of the hallways and shower rooms from control centers in Units 1-4, hallway guard patrol in Units 1-4, surveillance of cells and showers behind two sets of bars at the end of the gallery in Unit 5, the use of guard towers overlooking the "yard," and observation of the dormitory-style rooms and bathrooms in Unit 6 from a control office and from patrolling guards, who may view the bathroom through a hall window.
 
 
 34
 None of these techniques involves constant, intrusive observation. For instance, a guard monitoring the shower rooms in Units 1-4 must watch two shower rooms at the same time, through small, steam- and water-covered windows positioned in such a way as to hinder the guard's attempt to see every showering inmate's body in full. Guards monitoring inmates in Units 1-4 pass by the cells while on patrol, occasionally peering through a small window in the cell door which likewise does not afford the guard a full view of the inmate at all times. The view through a cell window of an inmate using the toilet is restricted by the size and position of the window. Guards occasionally open the cell door without notice to the inmate, to pass along a message or to observe the inmate.
 
 
 35
 In Unit 5, officers observe showering inmates from thirty feet away, through two sets of bars. There is also a partial wall partly enclosing the showers in Unit 5. Some of the showers in Unit 6 are equipped with partitions and curtains; the prison plans to install curtains on all Unit 6 showers. When inmates use these, only their feet are visible to a guard. Inmates using the urinal in the "yard" are monitored from the guard tower thirty feet above the urinal. The urinal is protected by a three-sided wall which, as the District Court found, permits an inmate the opportunity to minimize the view of his genital area from the guard tower.
 
 
 36
 In circumstances such as these, we are convinced that opposite-sex surveillance of male inmates, performed on the same basis as same-sex surveillance, is not "unreasonable" under the Turner analysis. Whatever minimal intrusions on an inmate's privacy may result from such surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concerns for safety and equal employment opportunities. See Michenfelder v. Sumner, 860 F.2d 328, 334 (9th Cir.1988) ("assigned positions of female guards that require only infrequent and casual observation, or observation at distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference"); Grummet v. Rushen, 779 F.2d 491, 496 (9th Cir.1985) ("(t)o restrict ... female guards from ... occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities"); Johnson v. Pa. Bureau of Corrections, 661 F.Supp. 425, 430 (W.D.Pa.1987); see also Miles v. Bell, 621 F.Supp. 51 (D.Conn.1985).
 
 
 37
 This observation is borne out by application of the Turner test. There is undoubtedly a rational connection between sex-neutral visual surveillance of inmates and the goal of prison security. Second, there are alternative means available for inmates to retain their privacy. The use of a covering towel while using the toilet or while dressing and body positioning while showering or using a urinal allow the more modest inmates to minimize invasions of their privacy. Third, the accommodations prescribed by the District Court adversely affect the guards and prison resources to a significant degree, by requiring many staffing adjustments (which have a particularly adverse effect on the female guards) and not insubstantial expenditures. Finally, these adjustments have more than a de minimis cost to prison objectives, by increasing costs and jeopardizing internal security.
 
 
 38
 As with the pat search policy, prison administrators are in the best position to balance the competing interests present in the context of visual surveillance techniques. Absent a showing that the resultant plan unequally balances such interests so as to violate a constitutional or a federal equal employment opportunity mandate, we must defer to their expertise.
 
 
 39
 Here, the administration has decided that the undifferentiated use of female guards is proper in all areas of the prison except in Unit 5. It has also concluded that additional barriers designed to enhance inmate privacy in various areas of the prison would jeopardize prison security. None of these measures--sex-neutral assignments in all areas of the prison except for Unit 5, male-only staff assignments in Unit 5, and maintaining the physical condition of the prison with no additional privacy measures--are prohibited. They neither impermissibly violate the inmates' privacy rights nor impermissibly violate the guards' equal employment rights.[13]
 
 III.
 
 40
 Turning to the inmates' claim that differences in privacy protections afforded male and female inmates in the Nebraska penal system violate the equal protection clause of the fourteenth amendment, we are persuaded that the analysis of this issue by the District Court is correct. The District Court found that male inmates and female inmates "are not similarly situated." Timm v. Gunter, No. CV85-L-501, at 15-16 (D.Neb. Dec. 13, 1988) (Memorandum of Decision). Recognizing that prisoners' privacy interests must be balanced against internal security concerns, the District Court found that
 
 
 41
 (t)he inmates require different security measures, not solely because of their gender, but because of different security concerns. Security concerns may arise from a variety of sources ... all of which may differ at various institutions and may or may not have some relationship with gender.... (P)ractices that pose no threat to the security of one institution may well be unacceptable at another institution that serves a different class of offenders.
 
 
 42
 Id. at 16 (emphasis added).
 
 
 43
 The District Court ruled that differences in security concerns at NSP and NCW (reflecting differences in the number and age of the inmates, the kinds of crimes committed by them, the length of sentences, and the frequency of incidents involving violence, escapes, or contraband) justified the differences in the security measures taken in the two prisons. We agree. See Williams v. Lane, 851 F.2d 867, 881 (7th Cir.1988) ("(u)nequal treatment among inmates ... is justified if it bears a rational relation to legitimate penal interest [sic]").
 
 IV.
 
 44
 For the foregoing reasons, we reverse the portions of the order of the District Court requiring that changes in policies, scheduling, and physical structures be made at NSP. We affirm those parts of the District Court's order deferring to the prison administration's expertise, i.e., those parts of the order concerning staffing decisions for Unit 5 and policy differences between NSP and NCW.
 
 
 45
 BRIGHT, Senior Circuit Judge, dissenting.
 
 
 46
 To treat men and women as equals does not require that courts ignore that differences exist. Even prisoners, men or women, are entitled to a modicum of privacy and are entitled not to be embarrassed by needlessly requiring that they expose their nakedness and private parts to guards who are of the opposite sex. The record shows that in the women's prison, female prisoners receive privacy considerations inasmuch as male guards have only very limited contact with the prisoners.
 
 
 47
 In this case, a Nebraska federal judge, the Honorable Warren Urbom, who in his twenty years on the federal bench has had extensive experience and contact with problems arising in the Nebraska State Penitentiary, and who heard several days of testimony, made specific findings on the issues and granted the male prisoners only limited relief on their complaint.
 
 
 48
 As the majority notes, that relief included: (1) all guards are to be instructed to refrain from deliberately searching an inmate's genital and anal areas while conducting a pat search; (2) female guards shall be allowed to perform pat searches on the same basis as male guards; (3) inmates, upon request, shall be pat searched by male guards, if the attending female guard decides that such a request is not disruptive and does not pose an undue security risk; (4) female guards shall be instructed to make "minor accommodations of courtesy" when patrolling rooms and galleries to avoid viewing inmates who are using toilet facilities or in a state of undress; and (5) prison administrators shall make various physical and schedule modifications at NSP to accommodate prisoner privacy interests. See supra p. 1098.
 
 
 49
 My colleagues have stripped the prisoners of these limited rights, and in doing so, have undertaken the fact finding function of the district judge. I respect the majority's right to differ with me and with the district judge on weighing the evidence, but I object to this reversal on the evidence merely because the majority, if they were the fact finders, would have reached a contrary result.
 
 
 50
 Assuming the Turner test applies, Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the fourth element is crucial, i.e., whether an alternative is available at only a de minimis cost to prison objectives. In this case, the evidence evinces several alternatives, as adopted by the district court, which protect prisoners' privacy rights at only a de minimis cost to prison objectives. For example, when fashioning relief with respect to pat searches, the district court expressly stated:
 
 
 51
 However, the institution can provide a limited accommodation to the plaintiffs' privacy interests without significant disruption. Accordingly, women will be permitted to perform pat searches under all circumstances in which men can perform them, and may be assigned to one-officer posts, provided that, whenever more than one officer is assigned to a post, the officers assigned must be all male or male and female. Inmates shall be allowed the choice of being searched by a male or female when both are on duty. Such a practice does not discriminate against women and offers nominal intrusion of the inmate's privacy. Likewise, if a male officer is in the immediate vicinity of an inmate who is about to be pat searched by a female officer and the male officer can perform the search without disruption of his duties in the opinion of the female officer, the search should be performed by the male officer upon request. An inmate should also be permitted to wait a reasonable period of time for the male officer to arrive, when doing so would not create an undue security risk in the judgment of the female officer on duty. In these circumstances, at least, the inmates will have an alternative open to them which will have de minimis impact on the institution, in contrast to the current procedures that exclude women.
 
 
 52
 Memorandum of Decision at 26 (emphasis added).
 
 
 53
 Likewise, with regard to relief in the housing units, the district court found that:
 
 
 54
 The best solution is one that alters the physical facilities in a manner that protects both security and privacy interests. Such a solution would have no adverse effects upon employment rights of male or female staff and would ensure privacy protections in the future.... I am persuaded that reasonable accommodations to inmate privacy in the showers can be made at minimal cost to valid penological objectives or employees' interests in equal employment experiences and options.
 
 
 55
 Id. at 29 (emphasis added).
 
 
 56
 Here, the district court examined the policies and considered the alternatives in light of the evidence. The result reached is supportable by the evidence and application of existing law.
 
 
 57
 I would affirm the district court in all respects.
 
 
 
 [1]
 The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska
 
 
 [2]
 With the exception of the defendant class of male employees, who do not appeal the District Court's ruling
 
 
 [3]
 The Honorable David L. Piester, United States Magistrate for the District of Nebraska. The parties agreed to a trial before the magistrate under the provisions of 28 U.S.C. Sec. 636(c)(1) (1988) and also agreed that any appeal would be taken only to the District Court, pursuant to 28 U.S.C. Sec. 636(c)(4) (1988)
 
 
 [4]
 We proceed in our analysis of this case on the assumption that inmates possess a constitutional right to privacy. For purposes of this case, it is not necessary for us to decide whether this unenumerated right exists or to define its constitutional foundation or scope, and we expressly decline to do so
 
 
 [5]
 At NCW, male guards are not assigned routinely to monitor shower rooms, and the showers are equipped with curtains. Cell-door windows have covering flaps that are usually left down, except when lifted by a guard to view the room. Further, the cell toilets have portable screens to block the view of the monitoring guards. Also, male officers do not perform cross-sex pat searches on a routine basis
 
 
 [6]
 These modifications include a window shade for the shower monitoring window in the control centers in Units 1-4, a partial door between the shower vestibule and the hallway in Units 1-4, toilet doors for the bathrooms in Unit 6, a privacy screen for dressing in Unit 6, and staffing of the control centers in Units 1-4 by male guards only for a minimum of two hours a day
 
 
 [7]
 The order of the magistrate in Nielsen, as affirmed by the District Court, is necessarily overruled to the extent it is incompatible with the order of the District Court in this case as modified by this opinion
 
 
 [8]
 Although Turner is a first amendment case, we believe its analysis equally applies to other inmates' rights cases. See Michenfelder v. Sumner, 860 F.2d 328, 331 n. 1 (9th Cir.1988)
 
 
 [9]
 One female guard testified that in her four years of performing pat searches, only two inmates objected. Another female guard stated that she performed about fifty pat searches in a four-month period, all without objection. A third female officer estimated that out of twenty pat searches performed, only one inmate objected. While this overwhelming acceptance of the practice is not evidence of its constitutionality, it does indicate the relatively low level of invasiveness and obtrusiveness of the opposite-sex pat searches performed at NSP
 
 
 [10]
 As a result of the current policy, female officers have not been assigned to one-officer posts, because resources do not permit the creation of a "roving" male guard position to assist in pat searches. The District Court found that this policy created scheduling difficulties, as well as resentment by male guards, tension among male and female employees, deterioration of morale, and a potential decrease in internal security. The current policy could also result in ineffective female supervisors as a result of their lack of experience in certain posts. Further, allowing inmates to "override" female guards by requesting that a male guard search them tends to decrease the female guards' authority over the inmates, and causes the female guards to feel like inferior officers. These factors can severely impede overall internal security. As to the possibility that female guards be restricted to conducting pat searches while excluding the groin area completely, the testimony indicates that such a
 practice would severely diminish the effectiveness of the search.
 
 
 [11]
 Of course, any such accommodations would have to take into account both the rights of inmates and the Title VII equal employment rights of prison employees. See 42 U.S.C. Sec. 2000e-2(a) (1988)
 
 
 [12]
 Cases from other courts support this notion. See Grummett v. Rushen, 779 F.2d 491 (9th Cir.1985) (allowing pat searches of male inmates by female guards, where the pat search includes the groin area); Madyun v. Franzen, 704 F.2d 954 (7th Cir.), cert. denied, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983) (upholding a policy permitting pat searches of males by female guards, even where there might be incidental contact with the genital area); Smith v. Fairman, 678 F.2d 52 (7th Cir.1982), cert. denied, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983) (upholding a policy permitting female guards to pat search male inmates, excluding the genital area); Bagley v. Watson, 579 F.Supp. 1099 (D.Oregon 1983) (upholding opposite-sex pat searches by female guards that includes a search of both the genital and buttock areas)
 
 
 [13]
 With respect to staff assignments in Unit 5 it would not necessarily be constitutionally impermissible to accommodate female guards' equal employment rights and the need for internal security by impinging on inmates' privacy rights. Neither is it a statutory violation to accommodate the privacy interests of the inmates and the need for internal security by excluding women from Unit 5 staff assignments. The District Court found that gender is not a bona fide occupational qualification for staff positions at NSP, but also found that a minimal restriction such as the Unit 5 gender-based staffing restriction does not deprive female employees of any employment opportunities. That finding is not clearly erroneous. Thus, as the District Court held, the Unit 5 staffing restriction does not violate Title VII. See 42 U.S.C. Sec. 2000e-2(e) (1988)