# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 00-10898

_____


NORMAN CHARLES OLIVER,

Plaintiff-Appellant,

VERSUS

WAYNE SCOTT, ET AL.,

Defendants,

WAYNE SCOTT,
GARY L. JOHNSON,
DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,
AND
CORRECTIONS CORPORATION OF AMERICA,

Defendants-Appellees,

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

January 9, 2002

Before BALDOCK,[*] SMITH, and                     EMILIO M. GARZA, Circuit Judges.

_____                    _____

[*] Circuit Judge of the Tenth Circuit Court of          [*](...continued)
(continued...)          Appeals, sitting by designation.

JERRY E. SMITH, Circuit Judge:

In this civil rights action brought pursuant to 42 U.S.C. § 1983, state jail inmate Norman Oliver challenges the practice of permitting female guards to monitor male inmates in bathrooms and showers but not using male guards to monitor female inmates under similar circumstances. Agreeing with the district court that there is no constitutional violation, we affirm that court's summary judgment.

I.

The Dawson State Jail Facility ("Dawson") is a correctional facility owned by the State of Texas through the Texas Department of Criminal Justice-State Jail Division ("TDCJ"). Through August 1998, Corrections Corporation of America ("CCA"), a private corporation, operated Dawson under a management contract with Dallas County, which in turn contracted with TDCJ. Management and Training Corporation ("MTC") assumed operation of the facility in September 1998.

Dawson, a ten-story facility housing about 2,000 inmates, began operations in July 1997. During its management, CCA housed inmates on all floors except the first and second. Dawson had only male inmates from July to November 1997, when female inmates began arriving. From November 1997 through August 1998, Dawson had about 250 females and 1,750 males.

The females were on the ninth floor, and the males were on the others. In the spring of 1998, at the direction of TDCJ, limited partitions were added to the bathroom areas of the ninth floor, where the females were housed; there was no instruction to install partitions on the male floors.

Oliver arrived in July 1997 as a post-conviction transfer inmate, serving concurrent ten- and nine-year sentences for robbery by threats and robbery causing bodily harm. Because of overcrowding in TDCJ facilities, Oliver had not been processed into one of TDCJ's Institutional Division facilities. Although Dawson was constructed to incarcerate state jail felons, a substantial number of male inmates there in 1997-98 were transfer inmates.

The status of transfer inmates is considerably different from that of state jail felons. Transfer inmates are awaiting transfer from a county jail to an Institutional Division facility; they are felons convicted of crimes resulting in greater sentences and fines than those imposed on state jail felons. Transfer inmates at Dawson were housed separately from state jail felons during CCA's management. No female transfer inmates were housed there during CCA's management; all female inmates were state jail felons, and most were non-violent offenders serving short sentences for crimes such as hot check writing and driving while intoxicated.

A few female guards, but mostly male, were assigned to monitor the male housing areas; this was necessary to staff all housing areas adequately, for security reasons. Moreover, prohibiting female officers on the male floors would conflict with CCA's equal employment policies and practices, which prohibit sex discrimination.

II.

Oliver sued state correctional officials Wayne Scott, Gary Johnson, and Janice Wilson, and CCA and MTC, alleging violations of his right to privacy, right to freedom from unreasonable search and seizure, and right to

equal protection under the Fourth and Fourteenth Amendments.[1] Oliver complains that female prison employees conducted strip searches of male inmates and observed male inmates showering and using the bathroom. Oliver alleges that male prison employees did not conduct strip searches of female inmates or observe female inmates in the bathroom.

Dawson had showers and toilet partitions that shielded female prisoners from view during their use of the facilities but did not provide the same privacy for male prisoners. Female officers made visual checks of the dorm areas, including these shower and bathroom areas. Oliver claims that the individual state defendants, as TDCJ executives, promulgated the policies, practices, and standards under which these alleged constitutional violations occurred and failed adequately to train and/or supervise their employees regarding strip search procedures.

### III.

The district court dismissed Oliver's claims against Scott and Johnson for failure to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). The court held that Oliver's transfer mooted his request for injunctive relief and that ongoing judicial supervision of a prisoner class action precluded additional judicial oversight of strip search procedures. The court held that the Eleventh Amendment bars damage claims against the officials in their official capacity and that the vague allegations about strip searches did not suffice to show individual

liability. Oliver's claim against Wilson and MTC was settled.

The district court also granted summary judgment in favor of CCA, holding that Oliver had failed to allege a specific unconstitutional search and seizure; Oliver did not provide any specific evidence of cross-sex strip searches. The court ruled that the CCA's interests in preserving security and equal employment opportunities justified any privacy invasion caused by cross-sex monitoring. The court reasoned that differences in the dangerousness of the male and female prisoners prevented Oliver from showing that they were "similarly situated" under the Equal Protection Clause. Finally, the court held that the Prison Litigation Reform Act ("PLRA") barred recovery, because Oliver had not demonstrated a physical injury.

### IV.

"We review the district court's ruling under [rule] 12(b)(6) *de novo*." *Shipp v. McMahon*, 234 F.3d 907, 911 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 2193 (2001). When ruling on a rule 12(b)(6) motion, the court must liberally construe the complaint in favor of the plaintiff and assume the truth of all pleaded facts. *Brown v. NationsBank Corp.*, 188 F.3d 579, 586 (5th Cir. 1999). "The court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). We must construe Oliver's *pro se* brief liberally in his favor. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

The generic pleading requirements of FED. R. CIV. P. 8 govern suits against individual defendants in their official capacity. *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439,

---

[1] On appeal, Oliver does not argue that cross-sex surveillance or searches violate his right to be free from unreasonable searches and seizures. He uses the Fourth Amendment only as a source of privacy rights.

443 (5th Cir. 1999). Oliver need only provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993) (citation omitted).

Plaintiffs suing governmental officials in their individual capacities, however, must allege specific conduct giving rise to a constitutional violation. *Anderson*, 184 F.3d at 443. This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to a constitutional violation. *Baker v. Putnal*, 75 F.3d 190, 194 (5th Cir. 1996).

### A.

Oliver requested two injunctions: (1) one banning opposite-sex strip searching in non-exigent circumstances and in front of non-security personnel; and (2) another requiring the installation of privacy partitions in front of shower doors and between toilets. The district court refused to exercise jurisdiction over the first request for injunctive relief, because TDCJ's strip search policies remained the subject of ongoing supervision by another federal district court. *See Aranda v. Lynaugh*, No. H-89-277 (S.D. Tex.). Individual prisoners cannot pursue suits for "equitable relief within the subject matter of the class action." *Gillespie v. Crawford*, 858 F.2d 1101, 1102-03 (5th Cir. 1988) (en banc). Claims for equitable relief can be made only through the class representative. *Long v. Collins*, 917 F.2d 3, 4-5 (5th Cir. 1990).

Even construing Oliver's *pro se* brief liberally, he does not raise this issue on appeal. Because Oliver does not contest dismissal of this claim, we need consider only his request for an injunction requiring privacy partitions.

Even assuming, *arguendo*, that Oliver has pleaded facts sufficient to support requiring privacy partitions at Dawson, that request is moot. The transfer of a prisoner out of an institution often will render his claims for injunctive relief moot.[2] Oliver, however, argues that his alleged constitutional violations are "capable of repetition yet evading review."[3]

Oliver must show either a "demonstrated probability" or a "reasonable expectation" that he would be transferred back to Dawson or released and reincarcerated there. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). At its most lenient, the standard is not "mathematically precise" and requires only a "reasonable likelihood" of repetition. *Honig v. Doe*, 484 U.S. 305, 318-19 (1988). Even under the most permissive interpretation, neither Oliver's complaint nor his appellate brief supports the claim that the constitutional violation is capable of repetition.

Oliver's brief alleges that the TDCJ's statewide policy of permitting cross-sex searches and monitoring makes the privacy violations

---

[2] *Weinstein v. Bradford*, 423 U.S. 147, 196 (1975) (per curiam) (plaintiff's individual suit challenging parole procedures mooted by release absent "demonstrated probability" that he would again be subject to parole board's jurisdiction); *Cooper v. Sheriff, Lubbock County, Tex.*, 929 F.2d 1078, 1081 (5th Cir. 1991) (per curiam) (holding that prisoner transferred out of offending institution could not state a claim for injunctive relief).

[3] *See Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir. 1975) (stating that possibility of transfer back would make claim capable of repetition yet evading review).

capable of repetition. The complaint itself, however, alleges, at most, facts sufficient only to support a claim for constitutional violations *at Dawson*. The complaint alleges that the warden acted "pursuant to" TDCJ policies, but it fails to identify any specific policy or to explain how those policies led to constitutional violations.

Neither Oliver's complaint nor his brief cogently explains how these statewide policies affect his current conditions of imprisonment. As we discuss below, TDCJ's policies are facially constitutional; Oliver's factual allegations challenge only their application. Nor does Oliver purport to represent prisoners or pretrial detainees still incarcerated at Dawson.[4] The district court correctly found that Oliver is not likely to suffer from these alleged constitutional violations again.

Second, Oliver's complaint requests statewide relief, namely that all Texas inmate facilities provide shower doors and toilet partitions. That claim fails for the same reason that the constitutional infractions at Dawson are not capable of repetition yet evading review. The complaint does not identify specific unconstitutional state policies or their application to other institutions; it does not plead facts that would prove male and female inmates are similarly situated. As explained in part IV.B, the only statewide policy identified by either party passes constitutional muster.

## B.

Oliver also sought damages against Scott and Johnson in their official and individual capacities. The district court held that the Eleventh Amendment bars Oliver's suit for damages against officials in their official capacity. We twice have held that the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity.[5]

Oliver contends that the officials should be individually liable for strip searches and cross-sex monitoring "pursuant to" TDCJ policies. Oliver must satisfy a heightened pleading standard to state a claim against Scott and Johnson in their individual capacities. *Baker*, 75 F.3d at 194. Section 1983 does not create supervisory or *respondeat superior* liability.[6] The individual officials may be liable only for implementing a policy that is "itself [ ] a repudiation of constitutional rights" and "the moving force of the constitutional violation." *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985). Oliver's complaint fails to identify specific policies or to explain how they permitted or possibly encouraged cross-sex strip searches and monitoring. He

---

[5] *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998) (extending Eleventh Amendment to TDCJ); *Aguilar v. TDCJ*, 160 F.3d 1052, 1054 (5th Cir. 1998) (extending immunity to TDCJ's officers acting in official capacity).

[6] *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999) ("Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under § 1983."); *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) ("Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability.").

---

[4] The Supreme Court has applied a more lenient standard where the named representatives' claims are mooted but the class will suffer repeated constitutional violations without judicial intervention. Then, the class members' live claims can justify exercising Article III jurisdiction. *E.g.*, *Bell v. Woolfish*, 441 U.S. 520, 527 n.5 (1979).

must plead such specific facts to survive a rule 12(b)(6) motion to dismiss claims against Scott and Johnson in their individual capacities.

The only policy that the parties identified at any point in the litigation is TDCJ Administrative Directive 3.22, which governs strip, pat-down, and visual searches.[7] The directive mandates "[w]hen possible staff of the same gender" should perform strip searches. Only the warden can approve cross-sex strip searches under "extraordinary circumstances."

Even if, *arguendo*, Wilson, the warden at Dawson, approved cross-sex strip searches absent extraordinary circumstances and thereby§§again *arguendo*§§violated Oliver's right to privacy or equal protection, *see Bell*, 441 U.S. at 558-60 (upholding strip searches as constitutional under a balancing test), the administrative directive narrowly cabins the scope of cross-sex strip searches and delegates the decision to the warden. Scott and Johnson cannot be held vicariously liable for Wilson's actions, and Oliver cannot credibly allege that the policy delegating the decision violates a constitutional right.

The administrative directive also states that prison guards of the same sex should perform visual and pat-down searches "when possible" or unless "circumstances dictate" otherwise.

Once again, this policy does not cause a constitutional violation.

By delegating the decision to lower officers, the policy allows for the possibility that a constitutional violation might occur, but it imposes no liability on the policymaker. Oliver might allege specific facts that would make lower-level officers liable for any unconstitutional *application* of the policy; the policy itself, however, is constitutional. The district court properly dismissed the complaint against Scott and Johnson for failure to allege an unconstitutional policy.

V.

Oliver argued that CCA had violated his privacy rights by permitting female guards to conduct surveillance of male inmates in showers and bathrooms and by failing to install privacy partitions.[8] Oliver further contended that because CCA took these measures to protect the privacy of female inmates, CCA violated his right to equal protection.[9]

---

[7] We could justify looking beyond the pleadings by converting the rule 12(b)(6) order into a dismissal at summary judgment. *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992). That is not necessary in this case. We look only to the specific administrative directive in an effort to construe the complaint liberally. The complaint itself is deficient.

[8] Because CCA no longer operates Dawson, and Oliver does not allege that CCA controls the privacy policies at other state institutions, only Oliver's request for damages remains pending against CCA.

[9] Some courts have held that cross-sex searches and monitoring can violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Jordan v. Gardner*, 986 F.2d 1521, 1530-31 (9th Cir. 1993) (finding that male guards' pat-down searches of female inmates violated the Eighth Amendment); *Johnson v. Phelan*, 69 F.3d 144, 152-53 (Posner, J., dissenting) (declaring cross-sex monitoring a violation of the Eighth Amendment). Oliver did not raise this argument in the district court, and he mentions the Eighth Amendment only once in his appellate brief. His

(continued...)

Supreme Court and Fifth Circuit precedent establishes that any minimal invasion of privacy is justified by the state's interest in promoting security. In support of his equal protection claim, Oliver failed to offer the necessary proof that male and female inmates were similarly situated.

The same standards for summary judgment bind us and the district court. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. *Id.* at 255. Once the moving party has shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. FED. R. CIV. P. 56(e); *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Securities & Exch.*

*Comm'n v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

### A.

Oliver could claim a privacy right under either the Fourth Amendment (applied to the states through the Fourteenth Amendment) or the Court's substantive due process doctrine.[10] In *Bell*, 441 U.S. at 558, the Court assumed *arguendo* that a prisoner might retain a Fourth Amendment right to privacy that could limit prison officials' powers to conduct body cavity searches. In *Hudson v. Palmer*, 468 U.S. 517, 527 (1984), however, the Court held that a prisoner lacks any Fourth Amendment privacy rights that would protect him from searches of his cell. The Court explained that "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* Prisoners retain, at best, a very minimal Fourth Amendment interest in privacy after incarceration.

The Fourteenth Amendment is an even more problematic source for a right to bodily privacy. Courts should not reverse the outcome of the Fourth Amendment analysis based on novel fundamental implied rights.[11] And the existing set of fundamental implied

---

[9](...continued)
decision to forego this argument is wise, given that we have refused to extend the Eighth Amendment to strip searches. *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999).

[10] *Baker v. McCollan*, 443 U.S. 137, 140 (1979) (stating that the first step in a § 1983 analysis is to identify the specific constitutional right involved).

[11] *Graham v. Connor*, 490 U.S. 386, 395 (1989) (stating that when the Fourth Amendment grants an explicit right to privacy, courts should not engage in substantive due process analysis); *Albright v. Oliver*, 510 U.S. 266, 273, (1994) (plurality) (preferring specific rights to the vagaries of substantive due process).

rightsSSmarriage, family procreation, and the right to bodily integritySSdoes not include a right to avoid exposure to members of the opposite sex. *Planned Parenthood v. Casey*, 505 U.S. 833, 847-49 (1992).[12] We would have to expand the Supreme Court's fundamental implied rights jurisprudence to create a right for prisoners not to have members of the opposite sex view them naked.

Despite these barriers to finding any constitutional right to bodily privacy, several courts of appeals, including this court, have found that prisoners possess such a constitutional right.[13] Even though any such

right is minimal, at best, we proceed to the next step of the due process analysis, balancing the intrusion against the state's legitimate penological interests.

The Supreme Court has mandated a lower standard of review for "prison regulations claimed to inhibit the exercise of constitutional rights."[14] We give great deference to prison administrators' judgments regarding jail security.[15] The regulation need only be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Four factors determine whether there is a reasonable relation: First, the regulation must have a "valid, rational" connection to the governmental interest put forth to justify it. *Id.* at 89-90. Second, the court should consider whether the inmate has alternative methods for exercising that right. *Id.* at 90. Third, the court should consider the impact that accommodation would have on other inmates or prison staff. Where the "ripple effect" is large, courts should have greater deference. *Id.* Finally, the existence of easy, rather than

---

[12] Even if, *arguendo*, the right to bodily integrity provides protection against body cavity searches, Oliver failed to present any summary judgment evidence of specific, cross-sex body cavity searches.

[13] All of the following cases support a limited right to bodily privacy, but none of them explains its derivation from the Supreme Court's Fourth or Fourteenth Amendment jurisprudence: *Moore*, 168 F.3d at 237 (holding that a female guard's strip search of a male prisoner might violate the Fourth Amendment if male guards were available and security did not require an immediate search); *Hayes v. Marriott*, 70 F.3d 1144, 1147-48 (10th Cir. 1996) (holding that body cavity search of male prisoner in front of female guards stated a claim for Fourth Amendment violation absent showing of security need); *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing a constitutional right to bodily privacy that might bar female prison guards from watching male inmates as they showered and used the toilet); *Kent v. Johnson*, 821 F.2d 1220, 1226-27 (6th Cir. 1987) (refusing to dismiss complaint that stated that female prison guards routinely saw male prisoners naked, showering, and using the toilet); *Lee v. Downs*, 641 F.2d 1117, 1119-20 (4th Cir. 1981) (stating that
(continued...)

[13](...continued)
"special sense of privacy in their genitals" justifies restricting female prison guards' surveillance of male prisoners). *Cf. Watt v. City of Richardson Police Dep't*, 849 F.2d 195, 199 (5th Cir. 1988) (finding that strip search of arrestee based on twenty-year-old minor drug offense violated the Fourth Amendment).

[14] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 344 (1987) (First Amendment); *Turner v. Safley*, 482 U.S. 78, 89 (1987) (mail and marriage regulations).

[15] *O'Lone*, 482 U.S. at 349; *Turner*, 482 U.S. at 89; *Elliot v. Lynn*, 38 F.3d 188, 191 (5th Cir. 1994).

hard, alternatives may demonstrate the regulation or policy is an "exaggerated response." *Id.*[16]

We twice have found that security concerns can justify the strip search of a male inmate in front of female guards. In *Letcher*, 968 F.2d at 510, we held that prison authorities constitutionally strip searched an inmate during a lockdown following a food fight. Similarly, in *Elliott*, 38 F.3d at 191-92, an increased incidence of prison murders, suicides, stabbings, and cuttings justified a shakedown that included mass strip searches in front of female employees.

In this case, the district court found that security concerns of a different kind justify cross-sex surveillance. CCA presented evidence that security was a legitimate concern at Dawson among male inmates because of their convictions for more severe and violent crimes; constant visual monitoring of all areas was necessary to maintain the security of the inmates and staff. Oliver did not challenge this evidence at summary judgment.

The four factors described in *Turner* lend support to this conclusion. First, the prison officials' policy of permitting all guards to monitor all inmates at all times increases the overall level of surveillance. Bathrooms and showers could serve as harbors for inmate-on-

inmate violence and sexual assaults. Dawson's policy ensures that the largest number of personnel remains available to monitor these areas and prevent these threats. Second, CCA permitted inmates to shield themselves with newspapers and paper towels. Third, requiring only male guards to supervise inmates at night and in the showers would have the ripple effect of forcing Dawson to reassign a high percentage of its prison staff. Finally, Oliver failed to identify an alternative that would create only *de minimis* costs in terms of inmate security or equal employment opportunities.

This court, in an unpublished but precedential opinion,[17] and several other courts of appeals have reached the same conclusion regarding cross-sex surveillance.[18] Oliver has

---

[16] The Court has distinguished this from a least-restrictive-alternatives test. *Turner*, 482 U.S. at 91 (stating that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence"); *O'Lone*, 482 U.S. at 350 (rejecting notion that prison officials must refuse all possible alternatives).

[17] *Barnett v. Collins*, 940 F.2d 1530 (5th Cir. 1991) (table) (unpublished) (upholding use of female guards in guard towers giving full view of male inmates taking showers).

[18] *Johnson*, 69 F.3d at 147 (Easterbrook, J.) ("If only men can monitor showers, then female guards are less useful to the prison; if female guards can't perform this task, the prison must have more guards on hand to cover for them."); *Timm v. Gunter*, 917 F.2d 1093, 1101-02 (8th Cir. 1990) (explaining that constant visual surveillance by guards of both sexes is a reasonable and necessary measure to promote inmate security); *Michenfelder v. Sumner*, 860 F.2d 328, 334 (9th Cir. 1988) (stating that espisodic and casual observation of male prisoners by female guards is justified by security concerns); *Grummet v. Rushen*, 779 F.2d 491, 496 (9th Cir. 1985) (stating that "[t]o restrict female guards from . . . occasional viewing of the inmates would necessitate a tremendous rearrangement of work schedules, and possibly produce a risk to both internal security needs and equal employment opportunities").

(continued...)

not provided sufficient summary judgment evidence to create a fact issue about the violation of his constitutional right to privacy.

## B.

Oliver argues that the existence of privacy partitions in the female inmates' showers and the absence of male guard surveillance prove that the state violated his equal protection rights. The district court correctly held that female and male inmates at Dawson are not similarly situated.

To prove an equal protection violation on the basis of sex, male prisoners must prove male and female prisoners are similarly situated. *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000) (citations omitted). Courts should consider "the number of inmates housed in each facility, their average length of stay, their security levels, and the incidence of violence and victimhood." *Id.* at 335.

At summary judgment, Oliver conceded: (1) Dawson housed six times many more men than women; (2) male transfer inmates were convicted of violent crimes; female inmates were convicted of the lowest level of felony in Texas; and (3) male units had a higher incidence of violent gang activity and sexual predation. All of the facts that justified round-the-clock surveillance by guards of both sexes applied uniquely to men. These facts certainly satisfy *Turner* and *O'Lone*'s lenient requirement that prison officials' regulations must be "reasonably related" to legitimate penological objectives.[19]

AFFIRMED.[20]

---

[19] *Timm*, 917 F.2d at 1103 (rejecting equal protection claim for failing to require cross-sex monitoring of women prisoners because treating the sexes differently was justified by different numbers of inmates, the severity of crimes, and frequency of inmate violence).

[20] In its brief on appeal, CCA argues that Oliver does not allege a physical injury within the purview of the PLRA, 42 U.S.C. § 1997e(e). We decline to reach this issue.

Applying the PLRA would raise difficult constitutional questions not previously addressed in this circuit. We have applied the PLRA's damage limits only to prisoners' claims of cruel and unusual punishment under the Eighth Amendment. In doing so, we have held that the PLRA's physical injury test is coextensive with the Eighth Amendment's physical injury test. *Siglar v. Hightower*, 112 F.3d 191, 193-94 (5th Cir. 1997).

We have not considered the application of the PLRA to constitutional violations usually unaccompanied by physical injury, such as First Amendment retaliation claims, privacy claims, and equal protection claims. The courts of appeals have reached different conclusions regarding whether the PLRA constitutionally may eliminate nominal and punitive damages for First Amendment and privacy violations. *Compare, e.g., Davis v. District of Columbia*, 158 F.3d 1342, 1348, 1349 (D.C. Cir. 1998) (holding that PLRA could constitutionally bar recovering punitive damages for privacy rights violations but reserving the question whether it bars nominal (continued...)

---

[18](...continued)
Many courts have identified protecting female prison guards' constitutional and statutory rights to equal employment opportunities as a legitimate penological objective. *E.g.*, *Johnson*, 69 F.3d at 147-48; *Timm*, 917 F.2d at 1102; *Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980). We do not need to reach the issue, because we conclude that the policy furthers the jail's interest in promoting security.

Judge Garza concurs in the judgment only.

---

[20](...continued)
damages); *with Allah v. Al-Hafeez*, 226 F.3d 247, 251-52 (3d Cir. 2000) (concluding that PLRA cannot constitutionally bar recovering punitive or nominal damages in First Amendment retaliation claim); *and Rowe v. Shake*, 196 F.3d 778, 781-82 (7th Cir. 1999) (holding that PLRA cannot bar declaratory relief or nominal damages for First Amendment violation).

Oliver's first amended complaint and appellate briefs plainly request punitive damages, so we would have to decide the constitutionality of applying the PLRA. On this issue, we lack the benefit of helpful circuit precedent or thorough briefing. Although it is technically a statutory interpretation issue, its resolution depends on constitutional concerns, and resolving it would be much more difficult than are the constitutional issues addressed in part V.