Lee Edward **FRANKLIN**, David
Holifield, Appellants,

v.

**A.L. LOCKHART,** Director; W. Sargent,
Warden; R. Perry, Captain; Arkansas
Department of Corrections, Appellees.

No. 88–2390.

United States Court of Appeals,
Eighth Circuit.

Submitted April 12, 1989.

Decided Aug. 30, 1989.

Steve Weaver, Little Rock, Ark. (court-appointed), for appellants.

Theodore Holder, Asst. Atty. Gen., Little Rock, Ark., for appellees.

Before BOWMAN and WOLLMAN, Circuit Judges, and HENLEY, Senior Circuit Judge.

WOLLMAN, Circuit Judge.

In *Franklin v. Lockhart,* 769 F.2d 509 (8th Cir.1985), we reversed that portion of the judgment which dismissed appellant Franklin's constitutional challenge, brought pursuant to 42 U.S.C. § 1983, to the strip searches conducted at the Cummins Unit of the Arkansas Department of Corrections. Pursuant to our remand directions, an evidentiary hearing was held before a magistrate,[1] who found no eighth amendment violation but held that as conducted the searches violated the fourth amendment. The magistrate recommended that the prison officials be enjoined from conducting visual body cavity (VBC) strip searches within view of other inmates not being searched simultaneously. The district court[2] adopted the magistrate's proposed fact findings and the eighth amendment holding, but rejected the recommendation regarding the injunction. The district court found that security concerns justified the searches and that the manner in which the searches were being conducted fell within the wide-ranging discretion granted to prison officials in matters relating to institutional security. We affirm.

## I.

The north and south wings of the East Building at Cummins house those inmates on punitive status for violation of an institutional rule. The rule violations range from violent assault to refusing to report for work. These inmates are strip searched twice daily, when the mattresses are removed in the morning and returned

---

1. The Honorable Henry L. Jones, Jr., United States Magistrate for the Eastern District of Arkansas.

2. The Honorable Garnett Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas.

in the evening. The inmates are searched regardless of whether they have left their cells or had unsupervised contact with anyone. All guards are pat searched and all inmate porters are strip searched before entering.

Usually five officers are used to conduct the searches. The inmates, two in each cell, are told to undress and back up to the opening in the door to be handcuffed. The officers then conduct a VBC search. The inmates are required to bend over or squat to reveal any object that might be concealed by the buttocks. Next, the inmates are ordered to exit the cell and stand facing the wall immediately opposite the door. While the inmates are facing the wall, the officers search the cell for approximately one minute. Inmates in cells on either side of the cell being searched can see the inmates in the hall during this time.

Before VBC searches were instituted in the East Building, the inmates were strip searched only when they were moved from their cells. This procedure did not stem the flow of contraband within this building. On one occasion an inmate stabbed and seriously wounded an officer with a homemade knife. After the stabbing, strip searches and cell searches were conducted twice a day, during which the inmates were allowed to remain dressed in their underwear. This procedure also proved ineffective. During one search, a twenty gauge shotgun shell was found that an inmate had attempted to conceal between his buttocks. The present policy of twice daily VBC strip searches began shortly thereafter, resulting in a drastic reduction in the flow of contraband.

Those inmates administratively segregated are housed in Barracks 16. Inmates are administratively segregated if they are being investigated for rule violations or are on forty-eight hour relief from punitive assignments. Prison officials consider the inmates in this building to be the most serious security threat of any inmates except those on death row.

In Barracks 16, the inmates are searched whenever they enter the barracks. About fifty of the inmates work during the day and are strip searched when they return to the barracks at noon and in the evening. The inmates first pass through a metal detector and then line up in the main hallway. Usually four inmates at a time are escorted into the sally port, along with one officer per inmate. In the sally port, which is an area that is somewhat enclosed, the inmates are told to undress. After the attending officers have conducted a VBC search, the inmates dress before being escorted into the barracks to their cells.

Inmates needing protective custody are housed in Barracks 14. These inmates include professed and suspected homosexuals, as well as inmates who for some reason are endangered in the general prison population. Unlike Barracks 16, Barracks 14 has no sally port. The strip searches in Barracks 14 are conducted in a manner similar to those in Barracks 16 except that the inmates are searched only at the end of the day. The inmates pass through a metal detector and then line up before the door. Five to six inmates at a time are escorted into the barracks. Because Barracks 14 does not have a sally port, the inmates undress and undergo a VBC search directly within the barracks. After this process, which takes less than a minute, the inmates receive their clothes and return to their cells.

Franklin, who has lived in both the East Building and Barracks 16, challenges the search procedures used in those buildings. He contends that the VBC searches violate the fourth amendment because they are unreasonable and constitute cruel and unusual punishment in violation of the eighth amendment. Holifield, who has lived in Barracks 14, challenges the procedures used there under the same grounds.

## II.

The fourth amendment prohibits only unreasonable searches. *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). In *Wolfish*, the Supreme Court upheld a detention facility's policy of conducting VBC searches of all pretrial detainees after contact visits with persons outside the prison. *Id.* at 560, 99

S.Ct. at 1885. In finding that the searches were reasonable, the court balanced "the need for the particular search against the invasion of personal rights that the search entail[ed]" with regard to the following factors: (1) the justification for initiating the search; and (2) the scope, manner, and place of the search. *Id.* at 559, 99 S.Ct. at 1884.

The Court concluded that the security concerns stated by the corrections officials outweighed the intrusiveness of the searches. The Court noted numerous recorded instances of inmates in other detention facilities secreting contraband, including drugs and weapons, in body cavities to smuggle into the facilities. Only one inmate, however, had been discovered attempting to secrete and smuggle contraband into the institution in question. The Court found that the lack of attempts "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." *Id.* at 559, 99 S.Ct. at 1884.

In *Goff v. Nix*, 803 F.2d 358 (8th Cir. 1986), *cert. denied*, 484 U.S. 835, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987), we relied upon *Wolfish* in upholding the constitutionality of VBC searches at a state prison. In that case, the prison officials implemented a policy of VBC searches of all inmates "as a condition of any movement outside their living unit or before being taken outside the confines of the [penitentiary]." *Id.* at 360. We first noted the policy established by *Wolfish* of granting prison administrators "wide-ranging" discretion, "particularly in regard to 'the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* at 362, quoting *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878. We then applied the *Wolfish* balancing test and found that the security concerns outweighed the "intrusion of the inmates' personal rights resulting from the VBC searches." *Goff*, 803 F.2d at 366.

Undeniably, the intrusiveness of VBC searches is significant. *See Wolfish*, 441 U.S. at 560–61, 99 S.Ct. at 1885–86. We are convinced, however, that under the guidelines established by *Wolfish* and *Goff* the security concerns articulated by the prison officials in this case justify the VBC searches in the East Building, Barracks 16, and Barracks 14. The East Building houses some of the most recalcitrant inmates. That the inmates are searched even if they do not leave their cells does not make the searches unreasonable. Based on the history of contraband in the building, the district court found that guards, inmate porters, and other outsiders occasionally gave the inmates contraband. The court also found that the inmates could fashion weapons from the fixtures in their cells.

The evidence established that both Barracks 16 and 14 also present significant security risks. Most of the inmates in Barracks 16 are segregated because they are repeated rule violators. Inmates in both barracks have daily outside contact. Moreover, with regard to both, prison officials testified that whenever inmates are taken out of the general prison population and are placed in a more restrictive environment, the inmates become more likely to smuggle contraband.

We also find that the manner and place in which the searches are conducted in Barracks 16 and 14 do not violate the fourth amendment. Prison officials testified that the alternatives of conducting the searches in the showers or behind portable hospital screens both presented security risks. The showers are located fifty feet within the barracks. Captain Perry, maximum security supervisor, testified that inmates being escorted through the barracks to the showers could slip contraband to inmates in the cells. According to the prison officials, using portable screens also presents unacceptable security risks. Cameras positioned in various places inside each of the barracks permit officers in the control booths to monitor all activities. Screens would prevent officers in the control booths from viewing some areas.

Because legitimate security concerns justify the VBC searches in question, and because the record does not support a find-

ing that a less public means of searching exists that would not compromise those security concerns, we hold that the searches as conducted at the Cummins Unit violate neither the eighth nor the fourth amendment when viewed in the light of *Wolfish* and *Goff.* *See also Michenfelder v. Sumner,* 860 F.2d 328, 332–333 (9th Cir. 1988); *Campbell v. Miller,* 787 F.2d 217, 228 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); *Dufrin v. Spreen,* 712 F.2d 1084, 1087 (6th Cir.1983); *Arruda v. Fair,* 710 F.2d 886, 888 (1st Cir.), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983).

Our holding is, of course, limited to the facts established in this case and should not be read to constitute a carte blanche approval of all VBC searches. Where there is no substantial evidence that the manner of the search is an "exaggerated * * * response to the perceived security concerns," however, we must give wide-ranging deference to prison officials on matters concerning institutional security. *Goff,* 803 F.2d at 362–63. We find no such exaggerated response here.

We express our appreciation to court-appointed counsel for their vigorous, thorough representation in this case.

The district court's judgment is affirmed.