# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2574

_____

| | | |
|---|---|---|
| Robin Hill, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| Kevin McKinley; Michael Miller; | * | District Court for the |
| Timothy Shoppe; Barry Thomas; | * | Southern District of Iowa. |
| Jennifer Holmes, | * | |
| | * | |
| Defendants/Appellants, | * | |
| | * | |
| Janet Doe; Paul Fitzgerald; Sheriff of | * | |
| Story County, Iowa; Michelle Bahr, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted:  December 14, 2001

Filed:  November 26, 2002

_____

Before WOLLMAN,[1] Chief Judge, FAGG, and HANSEN, Circuit Judges.

_____

WOLLMAN, Chief Judge.

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002.  He has been succeeded by the Honorable David R. Hansen.

Robin Hill brought this action under 42 U.S.C. § 1983, alleging that Kevin McKinley, Michael Miller, Timothy Shoppe, Barry Thomas, and Jennifer Holmes, all jail guards, Paul Fitzgerald, Sheriff of Story County, Iowa, and Michelle Bahr, the jail matron, violated her Fourth Amendment right to privacy. Hill also alleged a violation of her privacy rights under Iowa state law. The defendants raised the defense of qualified immunity to the federal claim in their answer, but the district court deferred ruling on this motion until after trial. The jury was given a single charge for both federal and state claims, and it found for Hill on both counts, awarding $2,500 in damages. The district court granted Fitzgerald's qualified immunity claim and dismissed the suit against Bahr based on the statute of limitations. The district court denied the remaining defendants' motions for judgment as a matter of law, qualified immunity, and for a reduction of damages, and granted attorney's fees to Hill. The remaining defendants appeal the rulings adverse to them. We affirm the district court's denial of judgment as a matter of law as to the Iowa state law claim and affirm the jury's award of damages. We reverse the district court's denial of qualified immunity on the federal claim, as well as the award of attorney's fees dependent on that federal claim.

## I.

On the evening of August 17, 1996, Hill was arrested for public intoxication while walking home from a bar in Nevada, Iowa. She had consumed a large amount of alcohol – more than three hours after her arrest, her blood alcohol content was measured at .306 g/dL. Michael Miller and Jennifer Holmes were on duty at the jail when a police officer, who is not a defendant in this action, brought Hill to the jail. The officer told them that Hill had assaulted another officer. Hill was uncooperative during the booking process, yelling and cursing at Holmes and Miller. The officers placed Hill in a holding cell, where she pounded and kicked at the door of the cell. After a short period of time, Holmes and Miller decided to place Hill in the jail's

padded cell. Hill cooperated with this transfer. Written jail policy states that prisoners placed in the padded cell are not allowed to wear normal clothing but instead must wear a paper gown or nothing at all. Holmes contends that she offered Hill a paper gown before the transfer but that Hill refused to wear it. Hill claims that she was not offered the gown and that Miller observed her remove her clothing. In any case, Hill was naked while in the padded cell. At some times while in this cell, she was quiet, but at other times she yelled and struck at the walls and door. Miller and Holmes claim that they were concerned that Hill was going to hurt herself.

Defendants Michelle Bahr, Tim Shoppe, Kevin McKinley, and Barry Thomas arrived shortly before the scheduled 11:00 p.m. shift change. Together with the newly arrived officers, Miller and Holmes decided to remove Hill from the padded cell and place her on a restraining board. The defendants claim that the decision was made for Hill's safety and that they decided to make the move at that time in part because the transfer required a greater number of guards than were on duty for each shift. Jail policy required the guards to quickly move prisoners from the padded cell to the restraint board, and the practice was to do so without regard to the prisoner's state of dress. Thomas and McKinley testified that they had previously been injured by prisoners they were attempting to restrain. Prior to moving Hill, the officers closed windows and food slots on nearby cells. The officers then removed Hill from the cell, walked her down a hall into another room, and strapped her to the restrainer board face-down, naked, and in a spread-eagle position. No one other than the defendants observed Hill while she was naked. She remained strapped to the board for approximately three hours. At some point, Bahr covered Hill's buttocks with a towel, although the parties dispute how long Hill was on the board before this was done. After Hill was released from the board, she was given a prison uniform to wear.

## II.

Defendants argue that the district court should have granted them judgment as a matter of law on the Fourth Amendment claim based on qualified immunity. This case is unusual in that the determination of the question of qualified immunity was first decided after a trial on the merits. The Supreme Court has emphasized repeatedly that qualified immunity is an "entitlement not to stand trial," and rulings on the issue should be made early "so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier v. Katz, 533 U.S. 194, 200 (2001). Like absolute immunity, the defense of qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Therefore, denials of qualified immunity are immediately appealable under 28 U.S.C. § 1291, "notwithstanding the absence of a final judgment." Id. at 530. The defendants raised the qualified immunity defense in their answer to Hill's third amended and substituted complaint, but did not file a motion for summary judgment, as is the usual practice. Although the defendants did not receive the benefit of an early resolution to their claim of qualified immunity, the defense is not waived by failure to assert it by motion prior to trial. Goff v. Bise, 173 F.3d 1068, 1072 (8th Cir. 1999). On appeal from a post-trial rejection of a qualified immunity defense, we consider the evidence in a light favorable to the prevailing party. Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999); Thompson v. Mahre, 110 F.3d 716, 721 (9th Cir. 1997). The issues of whether the evidence, when viewed in this light, establishes a constitutional violation and, if so, whether the right violated was clearly established at the time are questions of law that we review de novo. Elder v. Holloway, 510 U.S. 510, 516 (1994).

## A.

The threshold inquiry in a qualified immunity analysis decided on a motion for summary judgment is whether the plaintiff has alleged facts sufficient to establish a

constitutional violation. Hope v. Pelzer, 122 S. Ct. 2508, 2513 (2002). This inquiry is made first so that even if the right asserted is not clearly established, a determination that it was violated might "set forth principles which will become the basis for a holding that a right is clearly established." Saucier, 533 U.S. at 200 (2001). In reviewing this post-trial denial of qualified immunity, we examine the evidence presented at trial in a light favorable to Hill to determine if the evidence was so one-sided that defendants were entitled to prevail as a matter of law. Thompson, 110 F.3d at 721. Hill argued that her privacy rights were violated in three particular ways: 1) she was required to disrobe in the presence of a male officer; 2) she was required to walk through the jail nude in the presence of male officers; and 3) she was restrained nude on a restrainer board in the presence of male officers.

With respect to Hill's first claim, the parties dispute which guard required Hill to disrobe when she was placed in the padded cell. Hill testified that it was Miller, and Holmes testified that she had required Hill to undress. The jury was entitled to credit Hill's testimony that it was a male guard who required her to disrobe. Even if it was a male guard, however, we cannot say in light of precedent that it is a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female prisoner to disrobe in his presence before placing her in a padded cell for her own safety. Timm v. Gunter, 917 F.2d 1093, 1102 (8th Cir. 1990) (opposite sex surveillance performed on the same basis as same-sex surveillance not unreasonable where justified by safety and equal employment concerns); Franklin v. Lockhart, 883 F.2d 654, 656-57 (8th Cir. 1989) (visual body cavity searches conducted in view of other prisoners upheld absent substantial evidence that it was an exaggerated response to security concerns); see also Lee v. Downs, 641 F.2d 1117, 1120-21 (4th Cir. 1981) (upholding search of inmate's vagina by a female nurse in the presence of two male guards).

Regarding Hill's second claim, there is no dispute that Hill was unclothed when she was taken from the padded cell to the exercise room where the restrainer

board was located. Defendants followed their ordinary practice in moving a prisoner who is unruly enough to justify removal from a padded cell to restraints. Because there were not enough female guards available to transfer Hill, both male and female guards participated in the transfer. No one other than the defendants saw Hill naked as she walked from the padded cell to the exercise room. In light of these circumstances, we hold that use of male guards in an otherwise justified transfer of an unruly and naked female prisoner is not a violation of the Fourth Amendment. Timm, 917 F.2d at 1102; Franklin, 883 F.2d at 656-57.

The third violation of the Fourth Amendment asserted by Hill is having been secured to the restrainer board naked and spread-eagled in the presence of male officers. Hill was restrained in this manner for three and a half hours. She was naked when first brought into the exercise room and secured to the board, but it is disputed how long she remained naked before Bahr partially covered her with a towel. According to Bahr, Hill was covered almost immediately after she was placed on the board. Hill testified that she remained uncovered until just before she was released from the board. Although Hill's intoxication at the time of the incident and her subsequent inconsistent testimony undercut her credibility, the verdict indicates the jury believed Hill on several of the disputed points. Viewing the conflicting evidence in a light favorable to Hill, we assume that the jury found that she remained unclothed in the presence of male guards for more than a brief period of time. The interests of safety and security asserted by the defendants are sufficient to support the prompt restraining of a violent prisoner, even when she is naked and some male guards must be used to perform the procedure. Those same interests do not justify the continued exposure of a prisoner's genitals once she has been restrained and no longer poses any threat to herself or others. Hill's inability to minimize the privacy invasion by turning or covering herself in any way distinguishes this case from cases where opposite-sex monitoring is justified by security and safety concerns. Timm, 917 F.2d at 1102 (upholding opposite-sex monitoring and pat searches where inmates can shield themselves with a towel while in the toilet or shower and a same-sex rule

would significantly affect the cost of staffing and resources). Thus, we hold that Hill's Fourth Amendment rights were violated when the defendants allowed her to remain completely exposed to male guards for a substantial period of time after the threat to security and safety had passed.

Although we conclude that the facts establish a constitutional violation, we believe the defendants were entitled to qualified immunity on the ground that their actions did not violate clearly established law. Citing a prior case from our court for the proposition that we take a "broad view" of what constitutes clearly established law, Burnham v. Ianni, 119 F.3d 668, 677 (8th Cir. 1997), the district court concluded that the violation alleged in claim three was clearly established. Applying this "broad view," the district court held that a reasonable officer would have known that restraining Hill while she was unclothed was unwarranted. In Saucier, however, the Supreme Court stated that the inquiry into whether the alleged constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. Thus, the Supreme Court has directed that the lower courts not take too broad a view of what constitutes clearly established law.

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Hope, 122 S. Ct. at 2515 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (citation omitted). Thus, a precedential case need not be on all fours to clearly establish a constitutional violation, but it must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional. Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002).

The district court cited several cases indicating that prison officials must balance an inmate's right to privacy with the security needs of the institution. Order of June 15, 2001, at 29 (citing Bell v. Wolfish, 441 U.S. 520, 529 (1979); Chapman v. Nichols, 989 F.2d 393, 395-97 (10th Cir. 1993); Jones v. Edwards, 770 F.2d 739, 741-42 (8th Cir. 1985)). While this general statement of the law is correct, the cases do not clearly establish that defendants' actions were unconstitutional, especially given holdings in several other cases that prisoners have no general right not to be seen naked by guards of the opposite sex. See, e.g., Timm v. Gunter, 917 F.2d 1093, 1101-02 (8th Cir. 1990) (opposite-sex pat searches and monitoring of naked prisoners not violative of Fourth Amendment); Somers v. Thurman, 109 F.3d 614, 619-22 (9th Cir. 1997) (finding no clearly established right to be free of opposite-sex visual body cavity searches as of 1993); Johnson v. Phelan, 69 F.3d 144, 146 (7th Cir. 1995) (opposite-sex monitoring of naked prisoners permissible, guards "entitled to watch and regulate every detail of daily life"). Thus, the relevant authority indicates that prisoners are entitled to very narrow zones of privacy, and circumstances may warrant the most invasive of intrusions into bodily privacy. In light of this authority, we cannot say as a matter of law that it was clearly established in 1996 that a highly intoxicated, loud and violent prisoner could not constitutionally be restrained naked outside the view of all but a small number of guards. Thus, the district court should have ruled that the defendants were entitled to qualified immunity on Hill's Fourth Amendment claim.

Hill received an award of attorney's fees pursuant to 42 U.S.C. § 1988, which provides in pertinent part: "In any action or proceeding to enforce a provision of section[] . . . 1983, . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." Defendants argue that Hill is not a "prevailing party" on her federal claim because they are entitled to qualified immunity. Because we hold that defendants are entitled to qualified immunity on the federal claim, Hill is not a prevailing party on her section 1983 claim, and thus the section 1988 award of attorney's fees necessarily fails. Hewitt v. Helms, 482 U.S. 755, 759-60 (1987)

(qualified immunity dismissal of § 1983 claim where constitutional violation found but right was not clearly established precludes § 1988 award of attorney's fees); Hopkins v. Saunders, 199 F.3d 968, 978 (8th Cir. 1999) (same).

**B.**

The defendants also appeal from the denial of their motion for judgment as a matter of law on the merits of Hill's claims. Because the defendants are entitled to qualified immunity on the federal claim, we address only the state law claim. Hill sued under the "intrusion upon seclusion" theory of invasion of privacy. The district court submitted the federal and state law claims to the jury under the same instruction. That instruction properly listed the elements for intrusion upon seclusion under Iowa law, so in order to return a verdict for Hill the jury must have found that she proved all the elements of her state law claim.

"We review a district court's denial of a judgment as a matter of law de novo, applying the same standard as that employed by the district court." Belk v. City of Eldon, 228 F.3d 872, 877 (8th Cir. 2000), cert. denied 532 U.S. 1008 (2001). We resolve all doubts in favor of the non-moving party and give that party the benefit of all reasonable inferences. Id. "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." Id. at 877-78 (quoting McKnight v. Johnson Controls, 36 F.3d 1396, 1400 (8th Cir. 1994) (internal quotation omitted)).

Iowa has adopted the elements of invasion of privacy found in the Restatement (Second) of Torts § 652A. Winegard v. Larsen, 260 N.W.2d 816, 822 (Iowa 1977). According to the Restatement, the standard for "intrusion upon seclusion" is an "intentional intrusion upon the solitude or seclusion of another which would be highly offensive to a reasonable person." Id. (citing Restatement (Second) of Torts § 652B). The Iowa Supreme Court has not explained in any great detail the elements

-9-

required to meet this standard. Other courts that have confronted "intrusion upon seclusion" cases have emphasized that the conduct must be highly offensive to a reasonable person. See Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 622 (3rd Cir. 1992) (applying Pennsylvania law and citing the Restatement); Fields v. Atchinson, Topeka, and Santa Fe Ry. Co., 985 F. Supp. 1308, 1312 (D. Kan. 1997) ("both the manner of intrusion as well as the nature of the information acquired . . . must rise to the level of being highly offensive to the reasonable person"), withdrawn in part, 5 F. Supp. 2d 1160 (D. Kan. 1998); Watkins v. United Parcel Service, Inc., 797 F. Supp. 1349, 1359-60 (S.D. Miss. 1992) (Mississippi law requires conduct "to which a reasonable man would strongly object" and "some bad faith or utterly reckless prying"), aff'd, 979 F.2d 1535 (5th Cir. 1992).

Hill presented evidence to the effect that it was unnecessary and unreasonable for the defendants not to immediately cover her after they restrained her. We cannot say that as a matter of law the defendants' actions were not an unreasonable and highly offensive intrusion upon Hill's privacy. There is no question that being marched down a hallway by several persons, including members of the opposite sex, and then being strapped face-down to a board in a spread-eagle position, all while completely naked, would be considered highly offensive by ordinary persons. There is sufficient evidence to support the jury's apparent belief that the defendants did not need to restrain Hill naked in order to protect their safety and hers. Thus, we affirm the verdict as to the state law privacy claim.

## C.

The defendants also challenge the damages award, arguing that there is a causal disconnect between the physical damages award and the invasion of privacy tort. For tactical reasons, Hill did not claim the emotional distress damages ordinarily associated with intrusion upon seclusion, submitting instead only a claim for physical pain and suffering. The district court found that Hill was entitled to special damages

caused by the invasion, and the jury awarded Hill $2,500 for her physical pain and suffering.

Hill argued, and the district court accepted, the Restatement position that "special damage of which the invasion is a legal cause" may be recovered on an invasion of privacy claim. Restatement (Second) of Torts § 652H(c). According to Hill, the focus should be on the actions constituting the tort, but she offers no support for this assertion. The cases cited by the defendants suggest that to be recoverable on an invasion of privacy claim, special damages in the form of physical injuries and associated pain and suffering must be a result of the emotional distress associated with the invasion. Kjerstad v. Ravelette Publ'ns, Inc., 517 N.W.2d 419, 424 (S.D. 1994) (damages included vomiting, headaches, stomach sickness); Sabrina W. v. Willman, 540 N.W.2d 364, 370 (Neb. Ct. App. 1995) (listing as examples fright, shock, sleeplessness, and headaches). We are reluctant to reverse a jury award of damages. United States v. Larry Reed & Sons P'ship, 280 F.3d 1212, 1214 (8th Cir. 2002) ("[W]e will not reverse a jury verdict for insufficient evidence unless no reasonable juror could have returned a verdict for the non-moving party.") (quoting EFCO Corp. v. Symons Corp., 219 F.3d 734, 738 (8th Cir. 2000)). Based on the evidence presented at trial, a reasonable juror could have believed that the physical injuries from the straps were caused by the invasion of Hill's privacy rights in that the complete exposure caused Hill such anger and anguish that she naturally struggled against her bonds and thereby became bruised. Thus, we affirm the jury award of $2,500 in compensatory damages.

## III.

We emphasize our agreement with the dissent that Hill's rights were violated. We disagree only on whether the established law at the time of the violation was sufficiently clear to place a reasonable officer on notice that his conduct was unlawful. We hold that it was not and that the defendants are entitled to qualified

-11-

immunity on the Fourth Amendment claim.  Accordingly, we must also reverse the associated award of attorney's fees.  With respect to Hill's state law invasion of privacy claim, we affirm both the finding of liability and the damage award.

The judgment on the Fourth Amendment claim is reversed, as is the award of attorney's fees on that claim, and the case is remanded to the district court with direction to dismiss the complaint as to the Fourth Amendment claim and the claim for attorney's fees.  In all other respects, the judgment is affirmed.

HANSEN, Circuit Judge, dissenting.

Although the court states that the continuing restraint of Ms. Hill in a naked condition was unconstitutional, it concludes that the officers are entitled to qualified immunity on her federal claim because the law was not "clearly established" at the time of the restraint.  Because I believe that the constitutional violation began at the moment Ms. Hill was transported naked from the padded cell, and that the officers in this case had "fair warning" that their actions amounted to an unconstitutional invasion of Ms. Hill's privacy, I respectfully dissent from that portion of the court's opinion which grants the officers qualified immunity and which reverses the award of attorney's fees on the federal claim.

In analyzing the reasonableness of the officers' actions under the Fourth Amendment, this court must balance the need for such actions against the deprivation of privacy rights that resulted therefrom.[2]  See Bell v. Wolfish, 441 U.S. 520, 559 (1979).  The Supreme Court has historically given great deference to the policies and practices of prison administrators.  See, e.g., id. at 547 (noting that judicial deference

_____

[2]As an arrestee, Ms. Hill submitted her claim under the Fourth Amendment. Although some of the cases that I cite, as well as those relied upon by the court, apply a due process analysis, the methods and results under either analysis are sufficiently similar that I do not differentiate between these cases.

-12-

to prison administrators should be "wide-ranging," particularly in regard to "the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"); Pell v. Procunier, 417 U.S. 817, 822 (1974) ("'[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'") (citation omitted). But see Hudson v. Palmer, 468 U.S. 517, 523 (1984) ("[P]risoners [must] be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration."). Nevertheless, this is not a case involving prison administration or a convicted criminal.

To the extent that the court relies upon cases involving prisoners convicted of crimes, I must pause to note that the rights of these prisoners are not identical to those of Ms. Hill as an arrestee. The deference we give to prison administrators under the rubric of "legitimate penological interests" necessarily constrains the constitutional rights of convicted prisoners. See Turner v. Safley, 482 U.S. 78, 89 (1987). Incarceration by its very nature limits the extent to which convicted prisoners may legitimately expect privacy in their day-to-day lives. See Hudson, 468 U.S. at 526-28 (noting that convicted prisoners do not have a legitimate expectation of privacy in their prison cells). Unlike these prisoners, Ms. Hill, as a nonconvicted arrestee presumed to be innocent, fully retained her Fourth Amendment right to privacy, subject only to such reasonable constraints as must be imposed in the interest of safety or security. If there is substantial evidence in the record to indicate that the officials have exaggerated their response to otherwise legitimate safety concerns, then they no longer are shielded by their professional judgment. See Wolfish, 441 U.S. at 548.

After balancing the officers' concern about safety and their alleged need to transport and restrain Ms. Hill in a state of total nakedness against Ms. Hill's right to privacy, I conclude that the actions of the officers were unreasonable in the

circumstances of her detention. The potential danger Ms. Hill posed to the safety of herself and the officers on duty was significantly outweighed by her Fourth Amendment right to privacy. In defending their conduct, the officers rely upon a county jail policy that requires arrestees to remove their clothing when entering the padded cell, and upon the jail's usual practice of transporting these arrestees "as is" from the padded cell to the restraining board using no fewer than five officers. The officers claim that these methods are necessary for the safety of both the arrestee and the officers on duty. Officers apparently rely on the elements of surprise and an overwhelming show of force in moving the arrestee quickly from the padded cell to the restraining board, thereby avoiding any unnecessary delay where an officer might be injured by an arrestee's potentially violent actions.

I understand that arrestees whose conduct following arrest requires the use of a padded cell may present significant safety concerns to the officers on duty, and I agree that when severe, these concerns may justify the methods employed by the officers in this case. However, in the case of Ms. Hill, the application of the policy was both unnecessary and unreasonable. Instituting a blanket policy that is justified by legitimate safety concerns and therefore constitutional on its face cannot shield law enforcement officers from their continuing constitutional duty to evaluate the reasonableness of their actions in the light of the circumstances presented.

The arrestee in this case was a 110-pound, highly intoxicated female. Although she had been belligerent when officers attempted to book her and had yelled and pounded on the cell walls, both parties agree that she was compliant during her move to the padded cell and from that cell to the restraining board. Two officers had successfully moved Ms. Hill without incident from the holding cell to the padded cell, and she obeyed the male officer's order requiring her to disrobe, yet an hour later, the presence of six officers was allegedly insufficient protection to allow Ms. Hill even the briefest opportunity to cover herself before being escorted by male officers down the hallway and strapped to a restraining board. Any general concerns about officer

-14-

safety in removing an arrestee from the padded cell were certainly mitigated by the size of the arrestee in this case and the presence of six officers. Furthermore, once it was apparent that she would be compliant as she had been when moved from the holding cell to the padded cell, it was unreasonable for the officers to rely on a policy that obviously did not apply in the circumstances. This unreasonableness carried over with even greater force once Ms. Hill was restrained. At that point, there was absolutely no legitimate security purpose for failing to cover her naked body while she was strapped "spread-eagle" upon the board.

In concluding that Ms. Hill's rights in these circumstances were not "clearly established," the court cites a number of cases to support the proposition that female inmates have no general right not to be seen naked by guards of the opposite sex. While that proposition may be true, it is not the claim that Ms. Hill makes in this case. Instead, she alleges that the officers' actions on the night she was arrested were an unconstitutionally unreasonable application of their policies and practices. Unlike situations involving prisoners suspected of harboring contraband who are subjected to strip searches or visual body cavity searches, transporting an arrestee from a padded cell and securing her upon a restraining board do not necessarily require nudity, much less the prolonged exposure of the arrestee's genitals to members of the opposite sex. Because there was no legitimate security concern that required the officers to make Ms. Hill remain nude, the cases cited by the court are distinguishable.

The court cites Timm v. Gunter, 917 F.2d 1093 (8th Cir. 1990), in which the court upheld the employment of female guards at an all-male prison, finding that the interests in employment equality, efficient staffing, and prison security outweighed the minimal intrusions into the prisoners' privacy. Ms. Hill is not complaining about a general policy which allows surveillance by male guards or the fact that they viewed her naked in the padded cell. Rather, she alleges that their decision to remove her from the padded cell, escort her down the hallway, secure her to the restraining board,

-15-

and then leave her so restrained, all in a state of total nakedness, was degrading, humiliating, and an unreasonable application of jail policy. See Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people . . . have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons."). The court fails to distinguish between the incidental viewing of naked convicts that takes place in the day-to-day life of prisoners and the continuing total restraint of a spread-eagled naked woman in the presence of six officers. While the former may be reasonably necessary for the efficient day-to-day administration of a prison system, the latter was wholly unnecessary to protect either the safety of the arrestee or of the officers present.

The court also cites Franklin v. Lockhart, 883 F.2d 654 (8th Cir. 1989), in which the court upheld a prison's policy requiring daily visual body cavity searches of inmates serving time in administrative segregation. These searches were instituted as a response to an ongoing problem of weapons and drugs in the area of the prison housing the most dangerous and recalcitrant inmates. The court concluded that there was no less intrusive, equally effective method for ensuring the security of the prison. The court noted that its holding was limited to the facts of the case, and that such action is allowable only when it is not an "exaggerated response" to security concerns. See id. at 657. If requiring a compliant, 110-pound woman to remain nude while transporting her through the jail's hallway and securing her to a restraining board in the presence of six officers without so much as offering her a paper gown or a blanket is not an exaggerated response to security concerns, then I am unsure what is.

Finally, the court cites Lee v. Downs, 641 F.2d 1117 (4th Cir. 1981). This case involved an inmate who was being evaluated for a suspected suicide attempt. She was required to surrender her clothing, including her underwear and bra, because the

-16-

prison doctor believed she could hang herself with them. She was given a paper gown, but was later discovered burning it in her cell. Prison officials rightfully believed that she had matches in her possession, and therefore ordered the prison nurse to conduct a body cavity search, including a vaginal examination. Evidence showed that there was not a sufficient number of female guards available at the time to replace the two male guards who held her legs during the examination. Furthermore, there were no alternative methods for quickly recovering the potential contraband. This case also appears to be limited to its facts.

Furthermore, in Lee and other cases that followed it, the Fourth Circuit has repeatedly recognized that involuntary exposure of a detainee's genitals in the presence of people of the other sex may, when not reasonably necessary, constitute a violation of constitutionally protected rights. See id. at 1119; Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142 (4th Cir. 1982) ("[A]s a pretrial detainee Fisher had a general right, constitutionally protected, not to be subjected by state action to involuntary exposure in a state of nakedness to members of the opposite sex unless that exposure was reasonably necessary in maintaining her otherwise legal detention.") (emphasis added). In the circumstances, I conclude that Ms. Hill's exposure was not reasonably necessary to maintain her safety or the safety of the officers.

Because the actions of the officers amounted to a clear violation of Ms. Hill's rights, I do not believe they are entitled to qualified immunity. In Buckley v. Rogerson, 133 F.3d 1125 (8th Cir. 1998), our court explained:

> In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts.

-17-

133 F.3d at 1129 (citing <u>Norfleet v. Arkansas Dep't of Human Servs.</u>, 989 F.2d 289, 291 (8th Cir. 1993)). More recently, the Supreme Court reiterated the test for determining whether the law was "clearly established" for the purpose of granting qualified immunity. Under this analysis, a court must ask whether the state of the law gave the officers "fair warning" that their conduct was unconstitutional. <u>Hope v. Pelzer</u>, 122 S. Ct. 2508, 2516 (2002).

In examining our own case law, as well as that of the Supreme Court and other circuits, I conclude that at the time of Ms. Hill's arrest and detention, the officers had "fair warning" that their treatment of Ms. Hill was unconstitutional. In addition to legal precedent, a common notion of ordinary human decency should have alerted the officers to Ms. Hill's Fourth Amendment right against unreasonable intrusions upon her privacy. Indeed, under the <u>Wolfish</u> balancing analysis, they were required to evaluate the reasonableness of their actions. Given that the intrusion upon Ms. Hill's privacy was very significant, and that less intrusive, nonrisky methods were available, the cases cited by the court are not sufficiently analogous to provide the officers with a reasonable belief that their actions comported with the constitution.

The law was clearly established that involuntary exposure of a detainee's genitals in the presence of people of the other sex may, when not reasonably necessary, amount to a violation of constitutionally protected rights. Ms. Hill had a general right, constitutionally protected, not to be subjected to involuntary exposure and total incapacitation in a state of nakedness in the presence of members of the opposite sex unless that exposure was reasonably necessary to further a legitimate safety interest, namely the protection of either Ms. Hill or the officers. In its order denying qualified immunity, the district court stated:

> Only two reasons could conceivably justify moving Hill through the jail and placing her on the board naked: (1) the risk of injury to Hill or

others was so immediate that there was not time to permit Hill a brief opportunity to cover herself; [or] (2) Hill presented such a danger of assaultive behavior that giving her an opportunity to cover herself presented a significant risk of harm to Hill or the officers.

(App. p. 45.)  I agree with the district court that no reasonable officer could have believed that either of these conditions was present.  In the circumstances of this case, I find that Ms. Hill's officially-imposed nakedness was not reasonably necessary and therefore was a violation of her constitutionally protected right to privacy.  I would affirm the district court's denial of qualified immunity and uphold the award of attorney's fees in this case.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-19-