HANSEN, Circuit Judge,
dissenting.
Although the court states that the continuing restraint of Ms. Hill in a naked condition was unconstitutional, it concludes that the officers are entitled to qualified immunity on her federal claim because the law was not “clearly established” at the time of the restraint. Because I believe that the constitutional violation began at the moment Ms. Hill was transported naked from the padded cell, and that the officers in this case had “fair warning” that their actions amounted to an unconstitutional invasion of Ms. Hill’s privacy, I respectfully dissent from that portion of the court’s opinion which grants the officers qualified immunity and which reverses the award of attorney’s fees on the federal claim.
In analyzing the reasonableness of the officers’ actions under the Fourth Amendment, this court must balance the need for such actions against the deprivation of privacy rights that resulted therefrom.[2] See Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Supreme Court has historically given great deference to the policies and practices of prison administrators. See, e.g., id. at 547, 99 S.Ct. 1861 (noting that judicial deference to prison administrators should be “wide-ranging,” particularly in regard to “the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security”); Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (“ ‘[Ljawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.’ ”) (citation omitted). But see Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (“[P]ris-oners [must] be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objec *908 tives of incarceration.”)- Nevertheless, this is not a case involving prison administration or a convicted criminal.
To the extent that the court relies upon cases involving prisoners convicted of crimes, I must pause to note that the rights of these prisoners are not identical to those of Ms. Hill as an arrestee. The deference we give to prison administrators under the rubric of “legitimate penological interests” necessarily constrains the constitutional rights of convicted prisoners. See Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Incarceration by its very nature limits the extent to which convicted prisoners may legitimately expect privacy in their day-today lives. See Hudson, 468 U.S. at 526-28, 104 S.Ct. 3194 (noting that convicted prisoners do not have a legitimate expectation of privacy in their prison cells). Unlike these prisoners, Ms. Hill, as a noncon-victed arrestee presumed to be innocent, fully retained her Fourth Amendment right to privacy, subject only to such reasonable constraints as must be imposed in the interest of safety or security. If there is substantial evidence in the record to indicate that the officials have exaggerated their response to otherwise legitimate safety concerns, then they no longer are shielded by their professional judgment. See Wolfish, 441 U.S. at 548, 99 S.Ct. 1861.
After balancing the officers’ concern about safety and their alleged need to transport and restrain Ms. Hill in a state of total nakedness against Ms. Hill’s right to privacy, I conclude that the actions of the officers were unreasonable in the circumstances of her detention. The potential danger Ms. Hill posed to the safety of herself and the officers on duty was significantly outweighed by her Fourth Amendment right to privacy. In defending their conduct, the officers rely upon a county jail policy that requires arrestees to remove their clothing when entering the padded cell, and upon the jail’s usual practice of transporting these arrestees “as is” from the padded cell to the restraining board using no fewer than five officers. The officers claim that these methods are necessary for the safety of both the arrestee and the officers on duty. Officers apparently rely on the elements of surprise and an overwhelming show of force in moving the arrestee quickly from the padded cell to the restraining board, thereby avoiding any unnecessary delay where an officer might be injured by an arrestee’s potentially violent actions.
I understand that arrestees whose conduct following arrest requires the use of a padded cell may present significant safety concerns to the officers on duty, and I agree that when severe, these concerns may justify the methods employed by the officers in this case. However, in the case of Ms. Hill, the application of the policy was both unnecessary and unreasonable. Instituting a blanket policy that is justified by legitimate safety concerns and therefore constitutional on its face cannot shield law enforcement officers from their continuing constitutional duty to evaluate the reasonableness of their actions in the fight of the circumstances presented.
The arrestee in this case was a 110-pound, highly intoxicated female. Although she had been belligerent when officers attempted to book her and had yelled and pounded on the cell walls, both parties agree that she was compliant during her move to the padded cell and from that cell to the restraining board. Two officers had successfully moved Ms. Hill without incident from the holding cell to the padded cell, and she obeyed the male officer’s order requiring her to disrobe, yet an hour later, the presence of six officers was allegedly insufficient protection to allow Ms. Hill even the briefest opportunity to cover *909 herself before being escorted by male officers down the hallway and strapped to a restraining board. Any general concerns about officer safety in removing an arres-tee from the padded cell were certainly mitigated by the size of the arrestee in this case and the presence of six officers. Furthermore, once it was apparent that she would be compliant as she had been when moved from the holding cell to the padded cell, it was unreasonable for the officers to rely on a policy that obviously did not apply in the circumstances. This unreasonableness carried over with even greater force once Ms. Hill was restrained. At that point, there was absolutely no legitimate security purpose for failing to cover her naked body while she was strapped “spread-eagle” upon the board.
In concluding that Ms. Hill’s rights in these circumstances were not “clearly established,” the court cites a number of cases to support the proposition that female inmates have no general right not to be seen naked by guards of the opposite sex. While that proposition may be true, it is not the claim that Ms. Hill makes in this case. Instead, she alleges that the officers’ actions on the night she was arrested were an unconstitutionally unreasonable application of their policies and practices. Unlike situations involving prisoners suspected of harboring contraband who are subjected to strip searches or visual body cavity searches, transporting an arrestee from a padded cell and securing her upon a restraining board do not necessarily require nudity, much less the prolonged exposure of the arrestee’s genitals to members of the opposite sex. Because there was no legitimate security concern that required the officers to make Ms. Hill remain nude, the cases cited by the court are distinguishable.
The court cites Timm v. Gunter, 917 F.2d 1093 (8th Cir.1990), in which the court upheld the employment of female guards at an all-male prison, finding that the interests in employment equality, efficient staffing, and prison security outweighed the minimal intrusions into the prisoners’ privacy. Ms. Hill is not complaining about a general policy which allows surveillance by male guards or the fact that they viewed her naked in the padded cell. Rather, she alleges that their decision to remove her from the padded cell, escort her down the hallway, secure her to the restraining board, and then leave her so restrained, all in a state of total nakedness, was degrading, humiliating, and an unreasonable application of jail policy. See Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir.1981) (“Most people ... have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons.”). The court fails to distinguish between the incidental viewing of naked convicts that takes place in the day-to-day life of prisoners and the continuing total restraint of a spread-eagled naked woman in the presence of six officers. While the former may be reasonably necessary for the efficient day-to-day administration of a prison system, the latter was wholly unnecessary to protect either the safety of the arrestee or of the officers present.
The court also cites Franklin v. Lockhart, 883 F.2d 654 (8th Cir.1989), in which the court upheld a prison’s policy requiring daily visual body cavity searches of inmates serving time in administrative segregation. These searches were instituted as a response to an ongoing problem of weapons and drugs in the area of the prison housing the most dangerous and recalcitrant inmates. The court concluded that there was no less intrusive, equally *910 effective method for ensuring the security of the prison. The court noted that its holding was limited to the facts of the case, and that such action is allowable only when it is not an “exaggerated response” to security concerns. See id. at 657. If requiring a compliant, 110-pound woman to remain nude while transporting her through the jail’s hallway and securing her to a restraining board in the presence of six officers without so much as offering her a paper gown or a blanket is not an exaggerated response to security concerns, then I am unsure what is.
Finally, the court cites Lee v. Downs, 641 F.2d 1117 (4th Cir.1981). This case involved an inmate who was being evaluated for a suspected suicide attempt. She was required to surrender her clothing, including her underwear and bra, because the prison doctor believed she could hang herself with them. She was given a paper gown, but was later discovered burning it in her cell. Prison officials rightfully believed that she had matches in her possession, and therefore ordered the prison nurse to conduct a body cavity search, including a vaginal examination. Evidence showed that there was not a sufficient number of female guards available at the time to replace the two male guards who held her legs during the examination. Furthermore, there were no alternative methods for quickly recovering the potential contraband. This case also appears to be limited to its facts.
Furthermore, in Lee and other cases that followed it, the Fourth Circuit has repeatedly recognized that involuntary exposure of a detainee’s genitals in the presence of people of the other sex may, when not reasonably necessary, constitute a violation of constitutionally protected rights. See id. at 1119;- Fisher v. Washington Metro. Area Transit Auth., 690 -F.2d 1133, 1142 (4th Cir.1982) (“[A]s a pretrial detainee Fisher had a general right, constitutionally protected, not to be subjected by state action to involuntary exposure in a state of nakedness to members of the opposite sex unless that exposure was reasonably necessary in maintaining her otherwise legal detention.”) (emphasis added). In the circumstances, I conclude that Ms. Hill’s exposure was not reasonably necessary to maintain her safety or the safety of the officers.
Because the actions of the officers amounted to a clear violation of Ms. Hill’s rights, I do not believe they are entitled to qualified immunity. In Buckley v. Rogerson, 133 F.3d 1125 (8th Cir.1998), our court explained:
In order to determine whether a right is clearly established, it is not necessary that .the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts.
133 F.3d at 1129 (citing Norfleet v. Arkansas Dep’t of Human Servs., 989 F.2d 289, 291 (8th Cir.1993)). More recently, the Supreme Court reiterated the test for determining whether the law was “clearly established” for the purpose of granting qualified immunity. Under this analysis, a court must ask whether the state of the law gave the officers “fair warning” that their conduct was unconstitutional. Hope v. Pelzer, — U.S. -, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002).
In examining our own case law, as well as that of the Supreme Court and other circuits, I conclude that at the time of Ms. Hill’s arrest and detention, the officers had “fair warning” that their treatment of Ms. Hill was unconstitutional. In addition to legal precedent, a common notion of ordi *911 nary human decency should have alerted the officers to Ms. Hill’s Fourth Amendment right against unreasonable intrusions upon her privacy. Indeed, under the Wolfish balancing analysis, they were required to evaluate the reasonableness of their actions. Given that the intrusion upon Ms. Hill’s privacy was very significant, and that less intrusive, nonrisky methods were available, the cases cited by the court are not sufficiently analogous to provide the officers with a reasonable belief that their actions comported with the constitution.
The law was clearly established that involuntary exposure of a detainee’s genitals in the presence of people of the other sex may, when not reasonably necessary, amount to a violation of constitutionally protected rights. Ms. Hill had a general right, constitutionally protected, not to be subjected to involuntary exposure and total incapacitation in a state of nakedness in the presence of members of the opposite sex unless that exposure was reasonably necessary to further a legitimate safety interest, namely the protection of either Ms. Hill or the officers. In its order denying qualified immunity, the district court stated:
Only two reasons could conceivably justify moving Hill through the jail and placing her on the board naked: (1) the risk of injury to Hill or others was so immediate that there was not time to permit Hill a brief opportunity to cover herself; [or] (2) Hill presented such a danger of assaultive behavior that giving her an opportunity to cover herself presented a significant risk of harm to Hill or the officers.
(App. p. 45.) I agree with the district court that no reasonable officer could have believed that either of these conditions was present. In the circumstances of this case, I find that Ms. Hill’s officially-imposed nakedness was not reasonably necessary and therefore was a violation of her constitutionally protected right to privacy. I would affirm the district court’s denial of qualified immunity and uphold the award of attorney’s fees in this case.

. As an arrestee, Ms. Hill submitted her claim under the Fourth Amendment. Although some of the cases that I cite, as well as those relied upon by the court, apply a due process analysis, the methods and results under either analysis are sufficiently similar that I do not differentiate between these cases.